**Henry Lee LUCAS, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 69325.

Court of Criminal Appeals of Texas, En Banc.

March 22, 1989.

Rehearing Denied June 27, 1990.

36

Arvel (Rod) Ponton, III, El Paso, for appellant.

Ken Anderson, Dist. Atty., Georgetown, Walter C. Prentice, of counsel, Austin, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

W.C. DAVIS, Judge.

Appeal is taken from a conviction for capital murder. V.T.C.A. Penal Code, § 19.03(a)(2). After a change in venue from Williamson to Tom Green County, appellant was tried and convicted for the murder-rape of an unidentified woman whose nude body was discovered next to a culvert near Interstate 35 north of Georgetown. The jury returned affirmative answers to the first two special issues under Art. 37.071(b), V.A.C.C.P., and punishment was assessed at death. This direct appeal followed.

On appeal, appellant raises eighteen points of error, fourteen of which encompass claims regarding the admissibility of six aural and visual statements made by appellant to law enforcement officials between June of 1983 and February of 1984. In four other points, appellant challenges the admission of prior convictions for impeachment purposes against a defense alibi witness, the admission of extraneous offenses against appellant, the refusal of the trial court to instruct the jury on the voluntariness of appellant's confessions and the trial court's refusal to submit appellant's requested charge on Art. 37.071(b)(3), V.A.C.C.P. Appellant does not challenge the sufficiency of evidence to support the jury's verdict or answers to the special issues submitted at the penalty phase of trial. However, a recitation of pertinent facts will be helpful to disposition of the case.

The record reflects that on October 31, 1979, a motorist was driving in a northerly direction on the west service road of Interstate 35 north of Georgetown and south of the Walburg exit when he discovered the nude body of a young woman lying at the foot of a culvert located between the access road and the highway. He immediately drove to a gas station and telephoned the Williamson County Sheriff's Department. Shortly thereafter, various state and county law enforcement officials arrived at the scene and began the investigation.

Both physical and identification evidence was scarce. The body of the victim was unclothed except for a pair of orange socks. The only other physical evidence discovered in the area was a homemade sanitary napkin, two matchbook covers and an abalone shell ring on the victim's right hand. Lab tests were conducted on the above-mentioned articles as well as on fingernail clippings, pubic hair samples and particle samples from the woman's eye, with little result. Testing of the sanitary napkin revealed human blood of an unknown type. One of the matchbook covers,

from a motel in Oklahoma, contained unidentified writing. The fingernail clippings were found to include certain red and blue fibers but no trace of human skin. Tests run on the hair and particle samples were inconclusive. The abalone ring was misplaced somewhere between the time it was delivered to the Department of Public Safety Laboratory in Austin and the time of trial. Finally, unsuccessful attempts were made through fingerprint and physical description analysis to identify the victim and her assailant.

Travis County Medical Examiner Roberto Bayardo performed the post-mortem examination on the body. The forensic pathologist testified the cause of death was "asphyxia due to manual strangulation", marked by "purple cyanotic lividity of the head, neck and upper cheek" caused by ecchymosis, or the rupturing of the capillary vessels or petechiae. Death occurred ultimately from the carotid arteries being cut off, causing asphyxiation. Based upon the contents of the victim's stomach, Dr. Bayardo said the woman was killed between one and three hours after eating. Judged by the level of rigor mortis in the body, Bayardo thought the woman to have been dead between six and thirty-six hours before the autopsy was performed, and approximately twelve hours before the body was discovered. Forensic investigation did not yield an identification of the victim. In fact, the identity of the woman was still unknown at the time of trial.

On June 11, 1983, appellant was arrested in Montague County on the charge of unlawful possession of a firearm by a felon. See V.T.C.A. Penal Code, § 46.05.[1] While in the Montague County Jail, appellant sent word through a jailor that he wished to speak with W.F. Conway, sheriff of Montague County. Conway and Texas Ranger Phil Ryan met and talked with appellant, and received a handwritten statement appellant had previously made in which he confessed to multiple murders, including that of a Ringo, Texas, woman. After discussing the murder, appellant agreed to have a statement taken regarding that killing. During this conversation appellant also admitted murdering his common-law wife, Becky Powell. Although the instant offense was not discussed at this time, Sheriff Conway was aware of similar unsolved crimes in the Williamson County area and contacted Sheriff Jim Boutwell in Georgetown.

On June 22, 1983, Boutwell spoke with appellant for the first time. After being warned of his rights,[2] appellant agreed to talk with the sheriff. With appellant's knowledge the conversation was recorded. Prior to finishing the tape-recorded conversation, Boutwell wrote out a statement regarding the instant murder which appellant signed. The statement referred to appellant having picked up a female hitchhiker in Oklahoma, having sex with her at some unidentified off-the-road area before strangling her, having sex with the corpse at a later point in time, then dragging the body out of the car and dropping it into a culvert "somewhere on I–35, southbound toward San Antonio...."

Boutwell testified he took the next statement from appellant on July 31, 1983, when he returned to Montague County with a bench warrant for appellant from Williamson County. On that date, appellant gave the sheriff a drawing he had made of the victim and related more details of the crime. Appellant was again warned of his *Miranda* rights and agreed to the tape-recorded interview, saying he was not interested in talking to a lawyer but did wish to talk more with the sheriff. Boutwell drove appellant to the Williamson County Jail the following day.

On August 2, 1983, two video-taped interviews with appellant were made; one at the scene where the victim's body was discovered and one at the Williamson County Sheriff's Offices. Appellant was given *Miranda* warnings at the start of each inter-

1. Section 46.05 states in pertinent part:
 (a) A person who has been convicted of a felony involving an act of violence to a person or property commits an offense if he possesses a firearm away from the premises where he lives.

2. See *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

view, and his attorney was present at both interviews. In addition to the standard warnings given a criminal defendant at such times, appellant was also warned that his statement could lead to more serious charges being filed against him.

In the first, or road-side video, a handcuffed appellant is seen standing off the road near a guard-rail, behind which the ground slopes downward to a culvert running underneath Interstate 35. Appellant was warned by both the sheriff and his own defense attorney of the possible consequences of making a statement. His attorney uncategorically expressed his professional displeasure at appellant's cooperative conduct and warned appellant that any statement could lead to more serious charges being filed against him.[3] Appellant identified a picture of the victim and gave a descriptive statement regarding the events leading up to the killing. Following the pattern of his earlier written statement regarding the matter, appellant supplied more details of the incident. After having sex with the woman but not being "satisfied", appellant said he told the victim he wanted more sex but was refused. The woman then attempted to jump out of the car but her efforts were thwarted when appellant grabbed her. The two fought, almost causing an accident. Appellant then pulled the car over to the side of the road, strangled the woman, put her body in the back seat and drove further south on I35. Later, he again pulled over to the side of the road and copulated with the victim's corpse. When asked about his conduct after the victim resisted his advances appellant stated that he had already made up his mind to kill the young woman, and that he "preferred sex after death anyway."

A short while later, a second video-taped statement was taken at Boutwell's office in Georgetown. As with the road-side video, appellant was given his *Miranda* rights by the sheriff and warned against making any

statement by his defense counsel. In response to counsel's warning, appellant merely stated, "It's the only way I'll get peace of mind. If they kill me they kill me."

As in the earlier video statement, Boutwell questioned appellant regarding the circumstances leading up to the murder. Appellant's story was consistent with his earlier statements. He told how he struggled with the victim after she refused to have sex with him, how he had to stop the car because of the struggle, how he then killed her, put her in the rear seat of the automobile and had sex with her corpse, and how he then drove south on the highway to the area north of Georgetown where he dumped the woman's body into the culvert.

Sheriff Boutwell testified he took yet another statement from appellant on November 10, 1983, as he drove appellant from the county jail facility in Denton to the Williamson County lockup.[4] In this audio recording appellant said he had been in the habit of paying a foreman on a Florida roofing job to mark him present on the job site when he was, in fact, absent.

The last statement taken from appellant and played in severely edited form before the jury was a videotaped interview conducted on February 16, 1984, in Williamson County Jail. The particular statements allowed before the jury related to appellant's Florida work records which showed he had been working at a naval station roofing job at or near the time set by Dr. Bayardo as the time of the victim's death. Again, the import of the statement was that appellant had paid all or part of his paycheck on several occasions to a foreman in return for being marked as present on the job.

The testimony of Sheriff Boutwell ended the State's case-in-chief. The defense opened with Eilene Knight, secretary and bookkeeper for Southeast Color Coat, Inc., of Jacksonville, Florida. Knight, who

---

3. At this point in time, appellant had been charged with the murder of the unidentified woman. Following the August 2 and subsequent statements, the Grand Jury returned a capital murder indictment against appellant on January 19, 1984.

4. A short time before the transfer, appellant was tried and convicted for the offense of murdering Becky Powell, for which he received a life sentence.

knew appellant by sight, testified as the custodian of records for the business. She stated that foremen on the different jobs would fill out a "daily sheet" listing each worker's name and showing the number of hours worked on the day in question. She said the general superintendent on the Jacksonville Naval Air Station job was Mack Caulder, with the foreman being one Fred Ellis. Although Knight had no actual knowledge of any supervisor accepting kickbacks, she agreed that it was possible that absent workers could have been marked present in return for part of the employee's check.

Fred Ellis took the stand after Knight. He testified it was his practice to check each worker's name off the master list on the daily sheet as he saw the person on site. Ellis said that he had never received money for checking off the names of absent workers. After a hearing outside the presence of the jury, the State was allowed to question Ellis regarding his prior criminal record. He admitted a 1973 conviction for unauthorized use of electricity, a 1975 conviction for worthless check writing, and a second conviction for bad checks in 1979. Ellis also admitted he had denied the 1975 conviction a few moments earlier at the hearing outside the jury's presence.

Mack Caulder followed Ellis to the stand. Caulder testified he would take roll on the job site in the morning and afternoon. His time sheets for October 26th, 29th, 31st, and the first of November showed appellant marked as present at the naval air station jobsite. Caulder denied ever taking any bribes or being offered any kickbacks for falsifying work records. Later, after a hearing outside the jury's presence and over defense objection, the State was allowed to recall Caulder and question him about his criminal past. It was brought to the jury's attention that Caulder had been convicted of forgery in state district court in 1969, and a year later was again convicted of forgery in federal court. A prison sentence was assessed in both cases.

Following Ellis and Caulder to the stand during the defense case-in-chief was a Jacksonville grocery store owner named Monir Yazgi. Yazgi testified appellant would usually cash his paychecks at the store each week. Yazgi stated that a November 1, 1979, check was cashed in his presence, but on cross-examination admitted he was not sure if the signature on the back of the check was that of appellant.

The defense ended its case-in-chief with the expert testimony of a psychologist and of a psychiatrist. Dr. Tom Kubiszyn, a psychologist licensed and certified by the State of Texas, performed a psychological evaluation on appellant of approximately six and a half hours duration on February 28th and 29th of 1984. Dr. Kubiszyn testified that appellant has an IQ in the low average or low normal range, with strong feelings of inadequacy and inferiority, of evasiveness and suspiciousness. He diagnosed appellant as schizophrenic, rather than sociopathic, but partially recanted his earlier diagnosis on cross-examination when he admitted appellant did exhibit some characteristics of a sociopathic disorder. Kubiszyn also agreed that appellant, given his prior violent history in the murders of Kate Rich, Becky Powell and his 1960's conviction for the murder of his mother, was "potentially dangerous".

Austin psychiatrist Jay Fogelman concluded the defense case-in-chief. Over a period of three months, Dr. Fogelman conducted five interviews for a total of about six hours with appellant. He described appellant as having an antisocial personality but also suffering from schizophrenia and a schizotypal personality. To treat the schizophrenia, appellant was prescribed the antipsychotic drug Thorazine, a treatment discontinued shortly after June of 1983 but later reintroduced. On cross-examination, Dr. Fogelman stated that he was aware of a 1984 diagnosis different from his own wherein appellant was diagnosed as being a sexual deviate and having a sociopathic personality with a dissocial reaction. In response to a query from the prosecutor, the psychiatrist also opined that appellant was a dangerous individual.

At the rebuttal stage of trial, the State called five witnesses. Kenneth Emery, a roofer and carpenter for Labor, Inc., testi-

fied that Mack Caulder did not call roll every day, and, in addition, testified that appellant did not work every day but would be gone for two or three days at a time. The witness did not remember which particular days appellant was absent from work.

Dr. Clay Griffith, a Dallas psychiatrist, testified he examined appellant in June and again in October of 1983 and found his thought production to be "quite good." Unlike the defense experts, Griffith found no evidence of any delusional thinking or abnormal thinking or hallucinations, although appellant's intellectual level was "a little below average." In his opinion, appellant had never suffered and was not presently suffering from a mental disease or defect, but did exhibit a sociopathic personality disorder including necrophilic and zoophilic tendencies. On a scale of one to ten in terms of dangerousness, appellant was characterized as "one of the worst." The psychiatrist stated that one would have to "raise the scale some to find a place for Mr. Lucas." In Griffith's opinion, appellant was a "real manipulator," able to fake symptoms of mental illness.

Austin psychiatrist Richard Coons reached the same conclusion as did Griffith regarding appellant's exhibition of sociopathic rather than schizophrenic symptoms. Dr. Coons examined appellant pursuant to court order for over three hours in December of 1983 and also reviewed records of appellant's prior interviews and taped statements. Appellant's confessions, said Coons, exhibited "a startling lack of evidence of psychosis." While appellant was seen as having certain personality, moral and drug problems, Coons characterized such problems as social rather than medical or mental in nature.

The State next recalled Sheriff Boutwell to the stand. Over defense objection, an edited version of the November 10, 1983, audiotaped interview was admitted into evidence, wherein appellant for the first time connected Mack Caulder with the forged work records. The State then introduced edited versions of a December 30, 1983, videotape of appellant and Otis Toole, a co-defendant in an Austin murder case, and a February 16, 1984, videotaped interview wherein appellant confessed to the work-record scam.

As earlier noted, before closing, the State recalled Mack Caulder to the stand and questioned him regarding his prior convictions. The witness remained adamant that he had marked appellant present on October 31, 1979, solely because appellant was on the job site. In an effort to rehabilitate their witness, the defense team then recalled Kenneth Emery, who testified he had known Caulder for five years. According to Emery, he had never seen Caulder accept money for falsifying work records, but he knew the practice existed, as he had seen at least one foreman accepting money at the time paychecks were cashed. With that, the defense also closed, the charge was prepared and read, final arguments were made, and the jury was retired to deliberate.

In his first two points of error, appellant complains the trial court erred in admitting into evidence the written statement of June 22, 1983, as it was obtained in violation of his Fifth and Sixth Amendment rights to assistance of counsel, as well as his rights under Art. 1, Secs. 10 and 19 of the Texas Constitution. Appellant was arrested on the weapons charge on June 11, 1983. Between that day and the fifteenth of June, appellant allegedly attempted suicide. He was also taken before a magistrate and given his *Miranda* warnings. According to appellant, he requested an attorney twice; once when he was being booked into jail and again when he was taken before the magistrate. State witnesses denied appellant made any such request. On the fifteenth, appellant told jailor Joe Don Weaver either one of two things: that he wanted to talk to Sheriff Conway or that he had killed Becky Powell and Kate Rich, and wanted to talk with Conway. He also asked for paper and pen, with which he subsequently wrote a letter confessing to the murders of Rich and Powell as well as others over the past ten year period. Arriving at the jail, Conway told Weaver to ask appellant if he wanted Conway to have the letter. Appellant gave the letter to Weaver with instructions to give it to Con-

way. Weaver testified appellant was then taken to Conway's office. After being given *Miranda* warnings, appellant made and signed a confession regarding the Rich and Powell murders and also spoke to Conway concerning other killings.[5] It was on the basis of these latter statements that Conway made the telephone call to Sheriff Boutwell in Williamson County.

Recognizing the conflict in testimony as to when, if at all, appellant invoked his right to counsel, our attention is directed specifically to a portion of the letter written by appellant in his Montague County jail cell which was passed to Sheriff Conway at appellant's direction. The phrase was written at the bottom of the last page after appellant had confessed to several murders and scratched out his signature. The letter reads in pertinent part:

> What ever inside me I hope will leave me alone. Since I am not aloud to buy cigaretts or make phone calls to get any We will see what will come out of this mess. I have cigaretts at home but I can't get to call to get them and ____ one can't talk to me because I not allowed to contact any one. *I'm here in by myself and still can't talk with a lawyer on this.* I have no rights so what can I do to convince you about all this. I can't take you to where they are because no one believes me and what ever I say seem like I am talking to my self. I want to talk to Rev. Moore Ruben and see if he can advise me in some way as to what I should do but I can't because I not aloud to talk to him earlier because he doesn't want to be bothered with it. (Emphasis added)

■ There is no doubt that at the time appellant wrote his missive, adversarial proceedings had commenced against him for purposes of the Sixth and Fourteenth Amendments. *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Nehman v. State,* 721 S.W.2d 319 (Tex.Cr.App.1986). *See also Barnhill v. State,* 657 S.W.2d 131 (Tex.Cr.App.1983).

Therefore, the question to be addressed is whether appellant invoked his Fifth and Fourteenth Amendment rights to have counsel present during custodial interrogation. Although appellant now claims he requested counsel at the time of arrest and when warned by the magistrate several days later, the record does not reflect any such request. The record does reflect that appellant was given his *Miranda* rights at every stage; arrest, arraignment and interrogation, but never verbally requested an attorney. That conduct would appear to be both logical and consistent with appellant's decision from the very first to cooperate with the authorities.

The record also reflects that appellant requested his jailor give him writing materials and to ask the sheriff to come and talk with him. The question then becomes whether appellant invoked his right to counsel by his letter to Conway, and to that question we will now turn our attention.

■ The right to counsel is considered invoked where a person indicates he or she desires to speak to an attorney or have an attorney present during questioning. *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Ochoa v. State,* 573 S.W.2d 796 (Tex.Cr.App.1978). This right is invoked not only as to interrogation on the specific crime for which he is suspected, but also is invoked as to any other crime or other interrogators. *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). The essence of *Edwards v. Arizona,* supra, is the preservation of the integrity of an accused's choice to communicate with police only through counsel. *Patterson v. Illinois,* 487 U.S. 285, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988).

■ However, the mere mention of the word "attorney" or "lawyer", without more, does not automatically invoke the right; rather, a reviewing court must look at the totality of circumstances surround-

---

**5.** The State did not attempt to introduce any of the written statements taken from appellant by Conway on June 15, 1983.

ing the interrogation and alleged invocation. *Castillo v. State*, 742 S.W.2d 1 (Tex. Cr.App.1987) (pulling business card out and saying "this is my lawyer" does not invoke right); *Russell v. State*, 727 S.W.2d 573 (Tex.Cr.App.1987) (mere mention of word "lawyer" not an automatic invocation); *Collins v. State*, 727 S.W.2d 565 (Tex.Cr. App.1987) (defendant's inquiry to officer during interrogation did not invoke right to counsel because was directed to the future and concerned how counsel would be appointed); *Massengale v. State*, 710 S.W.2d 594 (Tex.Cr.App.1986) (appellant did not make clear assertion of right to consult with counsel when only told wife to get him lawyer and bondsman). *See also Porier v. State*, 662 S.W.2d 602 (Tex.Cr.App.1984); *Curtis v. State*, 640 S.W.2d 615 (Tex.Cr. App.1982); *Kelly v. State*, 621 S.W.2d 176 (Tex.Cr.App.1981); *Ochoa,* supra. *Compare Jones v. State*, 742 S.W.2d 398 (Tex. Cr.App.1987) (statement "I think I want a lawyer" clear and unequivocal assertion).

■ Where a person's invocation of his right to counsel is not clear and unambiguous, but is instead equivocal, the interrogating officers are not required to automatically cease the interview, but may continue questioning as long as the questions are specifically aimed at discovering whether the accused indeed wants to consult with counsel or wishes to proceed with the interview without benefit of counsel. *Russell,* supra.

■ Where the right to counsel is invoked, whether in an unambiguous manner or through clarification of an equivocal comment, it may be subsequently waived by express statement or actions of the person being interrogated, although an appeals court will not presume a waiver of said right. *See Janecka v. State*, 739 S.W.2d 813 (Tex.Cr.App.1987); *Mays v. State*, 726 S.W.2d 937 (Tex.Cr.App.1986). We hasten to add that such a waiver, to be effective in validating a confession drawn subsequent to the time in which the alleged waiver was made, must be the product of a conversation, interview or discussion initiated by the accused and must also be knowing, intelligent and voluntary, in the context of the facts of the particular case. *Smith v. Illinois*, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984); *Edwards v. Arizona,* supra; *Campell v. State*, 606 S.W.2d 862 (Tex.Crim.App.1980) and cases cited therein. *See also Mays,* supra, (explicit waiver not necessary; may be inferred by actions and words of person interrogated; *Dunn v. State*, 721 S.W.2d 325 (Tex.Cr.App.1986).

■ In the case before us, as stated *ante,* there was no express or unequivocal invocation of appellant's right to counsel made prior to June 15th. We now turn our attention to appellant's letter of that date to Sheriff Conway to make a determination whether that missive either clearly or equivocally expressed a desire to invoke appellant's right to counsel.

The part of the letter highlighted by appellate counsel is but a small portion of the whole statement which is rambling in style and accusatory in tone. Nowhere in his voluntary statement does appellant expressly request or demand to see an attorney; even should we desire to "read between the lines," as counsel would apparently have us do, appellant's statements reflect a frustration that "no one believes me" regarding his murderous activities, not frustration derived from being denied counsel actively sought. Appellant says that he "can't" talk with several people: an attorney, the sheriff, and "Rev. Moore Ruben", the latter because he "doesn't want to be bothered with it." Taken in context with the earlier part of the letter, it is clear to this Court that appellant in his letter of June 15th did not intend to invoke nor did he invoke his right to consult with counsel or place law enforcement authorities on notice that he could be invoking said right. Indeed, the phrase highlighted by appellant on appeal appears in a paragraph apparently written as an afterthought to his earlier admission of multiple murders.

■ In ruling upon the propriety of admission of appellant's June 22, 1983, statement to Sheriff Boutwell in alleged violation of constitutional guarantees of counsel, we have looked at all the circumstances surrounding appellant's arrest and

initial interrogation, and his subsequent interrogation by Boutwell on June 22, 1983. Contrary to his claim on appeal, we find no invocation of his right to counsel. At the most, we find an individual who by his own statements wanted to ease his mind by telling the authorities about the Rich, Powell and other murders. We are in agreement with the findings of fact and conclusions of law discussed *infra,* made by the trial judge and entered into the record after a *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), hearing was held on appellant's motion to suppress the June 22nd and other confessions in the case. The facts elicited at that hearing support the findings made by the trial court. As a general rule, we point out that the trial court is the sole judge of the credibility of the witnesses in a pre-trial hearing. Absent a showing by the party appealing those findings that the trial judge abused his discretion, the findings of the trial court supported by the evidence will not be disturbed on appeal. *Russell,* supra; *Hawkins v. State,* 613 S.W.2d 720 (Tex.Cr.App.1981). Here, the trial judge listened to all the evidence and obviously chose to believe the version of facts propounded by the State's witnesses and chose to resolve the conflicts in the State's favor. He found appellant never invoked his right to counsel orally or through the letter to Conway, and that he freely, knowingly and voluntarily waived his right to counsel prior to the taking of the June 22, 1983, confession to Boutwell. We agree. Once an accused "knowingly and intelligently" elects to proceed with an interrogation without benefit of counsel, the uncounseled statements he then makes need not be excluded at trial. *Patterson v. Illinois,* supra. Here, the record reflects appellant made an initial election, after proper warnings were given and acknowledged, to proceed without benefit of counsel, even though he was aware that counsel was on his way to the jail. The facts support the trial court's conclusion that appellant knowingly and intelligently waived his right to consult with counsel. *Id.* Appel-

lant's first and second points of error are overruled.

 In his third and fourth points of error appellant argues the trial court erred in admitting into evidence at the punishment phase of trial his statement of July 28, 1983, wherein he confessed to the murder of an Abilene woman, because said confession was taken in violation of his Fifth and Sixth Amendment and Art. I, Secs. 10 and 19 rights to counsel. Similar to his arguments under the first two points of error, appellant relies upon a finding that he invoked his constitutional rights, he never waived those rights and he was not the party who initiated further discussion. We agree with the State that appellant's initial premise is incorrect. As we pointed out, *ante,* appellant never invoked his right to counsel. *See Patterson v. Illinois,* supra. That being the case, we are not concerned with a subsequent waiver of those rights, nor with a query of who initiated a subsequent custodial discussion. We do note, however, that appellant also claims his attorney's letter of June 22nd to the Montague County Sheriff's Department[6] was sufficient to place law enforcement officials on notice appellant had invoked his right to counsel. In that letter, counsel, before consulting with appellant, invoked his Fifth Amendment right and stated that appellant did not waive any of his rights to have an attorney present during questioning. We do not agree. While it is axiomatic that interrogation must cease where a defendant indicates in any way he desires to invoke his right to counsel, *see Ochoa,* supra, at 800, it would be counterproductive to our system of justice to extend this rule as a prophylactic device to allow counsel to invoke the constitutional protection on behalf of a criminal defendant who has not yet met with counsel and has not himself expressed a desire to invoke that protection. *See Holloway v. State,* 691 S.W.2d 608 (Tex.Crim.App.1984). This Court has in the past rejected the claim that someone other than the accused may invoke his right to counsel. *See Dunn v. State,* 696 S.W.2d 561 (Tex.Crim.App.1985);

**6.** *See* Appendix, *infra.*

*Kelly*, supra. The record clearly reflects appointed counsel wrote the letter before consulting with his client on the case. Thus, appellant could not have consented to the attempted invocation. *See Holloway*, supra.

██ However, the record also reflects attorney Maxfield met with appellant twice on June 22nd, once shortly after delivering the letter to the sheriff's dispatcher or receptionist, and again later that afternoon. Although the mere meeting or consultation between an accused and counsel, without more, cannot be said to *automatically* invoke an accused's right to counsel during any and all subsequent interrogations, *see and compare Holloway*, supra, at 619 (dissenting opinion) (after counsel appointed and consults with accused, this amounts to invocation of right to counsel),[7] where the accused expresses his desire, after consultation, to invoke his rights, either by his own expression or through his attorney speaking for him, it will not be doubted that invocation has been made. At that time, the burden is placed upon the State to demonstrate an affirmative waiver of the right to counsel by the accused before interrogation may be continued.

In the case before us, the record shows counsel met with appellant on June 22nd, with the inference that counsel, as should be expected from an advocate properly protecting his client's rights, advised appellant to remain silent or have counsel present at future interrogations. Maxfield also testified he notified law enforcement authorities appellant wished to invoke his right to remain silent "(A)t one time or another" during the period of time between June and September of 1983, the effective dates of Maxfield's appointment to the Montague

County case against appellant. However, after some legal sparring between the State and defense over Maxfield's claim of the attorney-client privilege regarding whether appellant had indeed expressed a desire to talk with authorities against his counsel's advice, the following exchange occurred:

(Q) (By Mr. Walsh) Mr. Maxfield, this letter that you wrote, that you delivered to the sheriff's office, was that on—you delivered it on the morning of the 22nd?

(A) Yes, sir.

(Q) It talks about the defendant invoking his fifth and sixth amendment rights.

(A) Yes, sir.

(Q) When you drafted that letter, you had never spoken to your client; is that correct?

(A) That's correct.

(Q) And you are aware that these are rights that are personal to a defendant and can be waived or not waived.

(A) I'm aware they can be waived, yes, sir.

(Q) Okay. So I don't want any of your testimony or this exhibit to indicate to the Court that Henry Lee Lucas at any time had told you that he wanted to exercise these rights he had. Is that—

(A) That's correct, yes.

██ Attorney Maxfield's concern is understandable, even if we may not completely agree with the trial court that certain other questions asked for the purpose of determining whether appellant ever invoked or intended to invoke his right to counsel were "privileged" communication between attorney and client. In *Holloway*, supra, we noted the appellant offered no evidence to contradict the State's witnesses who testified the appellant indicated he un-

---

**7.** In his dissent in *Holloway*, supra, Judge Teague cites the case of *Wilkerson v. State*, 657 S.W.2d 784 (Tex.Crim.App.1983) as the authority for the proposition that appointment and consultation are a *per se* invocation. Appellant in his brief now cites *Holloway*, supra, and that proposition as authority. In *Holloway*, supra, counsel's attempts to unilaterally invoke his client's rights before consultation were held to be unsuccessful. In *Wilkerson*, supra, the record clearly showed the accused "repeatedly expressed" his desire not to speak with authori-

ties, was accompanied by counsel throughout the proceedings, *and* counsel had instructed the authorities not to question the accused in his absence. Thus, it was not a matter of an *automatic* invocation by result of appointment and consultation. Rather, in *Wilkerson*, supra, the accused and counsel let the former's invocation be shown throughout the proceedings, *see Wilkerson*, 657 S.W.2d at 791, while in *Holloway*, supra, even *after* consulting with counsel, the accused indicated he did not want counsel present during interrogation.

derstood his rights and he did not want an attorney present. Here, the attorney, given the opportunity to state on the record that appellant did indeed indicate his desire for assistance of counsel at subsequent interrogations, instead chose to claim the privilege of professional communication. At the same time, counsel admitted Sheriff Conway never denied him any sort of opportunity or chance to consult with appellant during questioning. Finally, the exchange recited above reflects the attorney's admission that appellant never said he wished to exercise those rights.

The record also reflects more than simply a strong inference that appellant deliberately chose not to follow counsel's advice. Speaking in general terms about the 3–4 month time period he represented appellant, Maxfield admitted he had told others of appellant's proclivity for talking to the authorities:

(Q) During that time did it ever come up in those conversations that Lucas wanted to talk, was talking, and that you wished he wouldn't but you couldn't stop it?

(A) I'm sure it did.

(Q) Okay. So do you recall, at least if it wasn't Phil Ryan, you told somebody that?

(A) Well, I don't recall the specific words, but I think, yes, that probably I said something along those lines.

This is not to say appellant talked to everyone who came calling. The following, again between prosecutor Walsh and attorney Maxfield, shows he demonstrated a modicum of discretion in his communications with the authorities:

(Q) Let's say whenever some third person may have been present other than a member of your staff or another lawyer. Did you ever see Henry Lee Lucas invoke his fifth or sixth amendment rights in your presence with any third party?

(A) Yes.

(Q) Who was that?

(A) I don't know his name. He was an investigator with the Colorado Bureau of Investigation. And the date I'm going to say was sometime in August.

(Q) August of '83?

(A) Of '83, yes.

(Q) Okay. How did that come about, did he make Henry mad or why did that come about?

(A) I can't speculate on what Henry's motives were.

(Q) But that indicates that Mr. Lucas does know that if he doesn't want to talk to somebody, he doesn't have to. Is that what that indicated to you when he did that?

(A) I suppose that's a logical assumption, yes, sir.

■ Appellant's is admittedly a rare case in the annals of state jurisprudence. While his various appointed attorneys cautioned discretion and silence, Lucas appears to have been determined to speak to the authorities desiring his attention. In what may be best termed a single-minded purpose, he appears to have rejected his right to remain silent and put the State to its burden of proving a particular crime. Indeed, as in the case before us, appellant made what can only be termed a conscious practice of informing on himself as to crimes which, up until that point in time, remained unsolved. For whatever reason, we can trace the beginnings of his compulsive behavior in admitting complicity in unsolved homicides to his letter of June 15th to Sheriff Conway, where Lucas stated he wanted to talk about the killings and about where the bodies were buried, if someone would listen. Given the particular facts and circumstances of the case, we remain unconvinced appellant invoked his constitutional right to consult with counsel. To hold otherwise would be to refuse to grant proper respect to appellant's own desire to confess his criminal conduct on his own terms. Somewhat analogous to the standard used to determine whether an accused waives his right to counsel once invoked, we have examined the facts and circumstances involved in the present case to determine whether appellant intelligently and knowingly abandoned or relinquished his right to counsel. See *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Holloway*, and *Wilkerson*, both supra. Taking into account appellant's back-

ground in having previously been involved in serious legal difficulties, his age and maturity, his conduct in unequivocally co-operating with authorities to the extent of providing necessary evidence to resolve previously unsolved crimes,[8] the lack of direct evidence in the record showing appellant "expressed his desire to deal with the police only through counsel," *Patterson v. Illinois*, supra 108 S.Ct. at 2394, citing *Edwards v. Arizona*, supra 451 U.S. at 484–485, 101 S.Ct. at 1885, and recognizing the trial court must weigh and evaluate the testimony of witnesses in the *Jackson v. Denno*, supra, hearing to determine the credibility of each witness, *see Hawkins v. State*, 660 S.W.2d 65 (Tex.Crim.App.1983), we cannot say the trial judge here abused his discretion in admitting appellant's statement of July 28th, 1983. Appellant's third and fourth points of error are overruled.

▪ Appellant's fifth and sixth points claim error of constitutional magnitude as in his first four points, the question being whether the trial court erred in admitting appellant's audiotaped confession of July 31, 1983, in violation of his Fifth and Sixth Amendment rights to counsel. Again, appellant relies upon a determination that he had invoked his right to counsel and had not initiated the meeting leading to the confession. Again, we must disagree that appellant invoked his right to counsel. There is no evidence in the record to suggest a change in appellant's conduct regarding interested law enforcement agencies between June 22nd and July 31st. While it is true Sheriff Boutwell initiated the meeting in question, since appellant

had not chosen to invoke his Fifth Amendment right and affirmatively waived his rights at the beginning of the audiotape, saying, "I ain't interested in a lawyer," the State is not required to show appellant initiated the conversation. *See Stone v. State*, 612 S.W.2d 542 (Tex.Cr.App.1981). We will reiterate that the tapes of the conversations in question undeniably demonstrate appellant's ongoing desire to talk to the authorities, regardless of the personal cost to himself. For the same reasons enunciated above in appellant's first four points, we overrule the fifth and sixth points of error.

In his seventh point of error, appellant claims the trial court erred in admitting, over objection, evidence that Mack Caulder had previously been convicted on a forgery charge in 1969 and a federal forgery charge in 1970, for which he was released from prison either in 1971 or 1972. Specifically, appellant argues the two convictions were too remote in time to be admissible.

▪ A witness in a criminal case may be impeached with proof of a final felony conviction or a final misdemeanor conviction involving moral turpitude. Art. 38.29, V.A.C.C.P. *Now see* TEX.R.CRIM.EVID. 609.[9] However, this Court has placed limits on that general proposition by holding that evidence of extremely remote convictions cannot be admitted for purposes of impeachment. *Miller v. State*, 549 S.W.2d 402 (Tex.Cr.App.1977). The general rule of thumb has evolved into one stating that where the release from confinement is less

---

8. The record not only reflects that appellant chose to provide incriminating evidence regarding murders before his trial on the instant case, but also that appellant, after being sentenced to death, was granted special dispensation at his own request to remain incarcerated in Williamson County so he could assist various law enforcement agencies in resolving additional unsolved homicides.

9. Art. 38.29, supra, in effect at the time of appellant's trial, was repealed by Texas Rules of Criminal Evidence effective September 1, 1986. Rule 609 states in pertinent part:

 (a) *General rule.* For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted

if elicited from him or established by public record but only if the crime was a felony or involved moral turpitude, regardless of punishment, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to a party.

 (b) *Time limit.* Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.

than ten years prior to the proceeding in which the conviction is sought to be used, the conviction is admissible. *Taylor v. State*, 612 S.W.2d 566 (Tex.Cr.App.1981); *Davis v. State*, 545 S.W.2d 147 (Tex.Cr. App.1976); *Bustillos v. State*, 464 S.W.2d 118 (Tex.Cr.App.1971). *Now see* TEX.R. CRIM.EVID. 609(b), supra.

■ The State admits the prior convictions fall outside the scope of the general rule but argues impeachment through the use of the priors was proper since it was shown Caulder remained unreformed from his previous criminal conduct. It is true we have carved out an exception to the general ten-year rule where the State, able to demonstrate that a particular witness has not reformed into a law-abiding citizen, has been allowed to introduce evidence of prior convictions which became final more than ten years before. The rule is one of analyzing the totality of circumstances in the case. Regardless of the time element, the facts and circumstances of each case must be looked to and considered in determining the question of remoteness. *Davis,* supra; *Dillard v. State*, 153 Tex.Cr.R. 134, 218 S.W.2d 476 (Tex.Cr.App.1949). Evidence of the lack of reformation *or* subsequent felony and certain misdemeanor convictions may then cause the prior conviction to fall outside the general rule and not be subject to the objection of remoteness. *Crisp v. State*, 470 S.W.2d 58 (Tex.Cr.App. 1971); *Gill v. State*, 147 Tex.Cr.R. 392, 181 S.W.2d 276 (Tex.Cr.App.1944). *See also Davis,* supra, at 150. The question is one of discretion for the trial court. *Davis* and *Bustillos,* both supra.

Speaking in terms of application of the rule to a criminal defendant who chooses to testify, this Court in *Dillard,* supra, outlined some of the circumstances to consider:

> In the light of such rule, then, the age of the accused, his conduct as reflecting non-reformation on his part, the nature of the accusation and attendant facts for which he is upon trial, and the length and severity of the penalty inflicted are to be considered.

■ In the present case we are dealing not with an accused but with a defense witness not otherwise connected to the matters at trial. Thus, all the attendant circumstances expressed in *Dillard,* supra, later recited in *Davis* and *Bustillos,* both supra, are not directly applicable, even though the underlying principle remains the same. *See Lott v. State*, 123 Tex.Cr.R. 591, 60 S.W.2d 223 (Tex.Crim.App.1933). (The difference in receiving impeaching testimony by proof of prior convictions against an accused versus a mere witness is not so much the admissibility of the testimony as it is error in the receipt thereof, which is much more serious when it relates to the accused than when it affects one who was a mere witness in the case.) Therefore, we are still concerned with the witness' age at the time of the prior incident, his conduct in the intervening years as reflecting non-reformation on his part, including subsequent final felony and misdemeanor convictions of moral turpitude, and especially the relationship or nexus between the intervening conduct and the prior convictions.

Caulder was born in 1930. At the time he was convicted of the prior offenses he was approximately 39 years of age. Between the time he was released and the start of appellant's trial, there is no evidence he suffered a final felony conviction or a misdemeanor conviction involving moral turpitude. Caulder did admit to being arrested in South Carolina for drunken driving and leaving the state before going to trial. From the record, it is clear Caulder knew he would be required to make an appearance in the case but instead left the state before prosecution could begin. By itself, the above evidence relating to a charge of drunken driving would not appear to be an adequate reflection of an individual's lack of reformation, since the State cannot point to a proper *final* conviction to connect Caulder's previous criminal conduct with subsequent conduct demonstrating similar propensities. However, the rule embraces more than evidence of proper *conviction;* also to be considered as evidence of Caulder's failure to conform to legal mores is his *conduct* in the interven-

ing years as it may reflect upon his lack of reformation. *See Crisp*, supra; *Gill*, supra. Here, the State cited as examples of the witness's conduct his flight from South Carolina and his participation in the alleged "kick-back" scheme in Florida.

Caulder left the state of South Carolina in 1973 or 1974 in order to avoid prosecution for the offense of D.W.I. While the offense itself may not be one for which a conviction may be used to show lack of reformation, we certainly think an individual's conduct in illegally avoiding the justice system demonstrates that person's lack of commitment to conform to the legal dictates of society and its representatives. However, the evidence reflecting Caulder's flight from authority, occurring ten years before the instant trial, is itself somewhat remote in terms of the witness's *present* character. The only other evidence reflecting lack of reformation is the contested fact issue of Caulder's alleged participation in a "kick-back" scheme, introduced by the State to rebut the defensive theory of alibi. Our opinion in *Crisp*, supra, spoke in general terms of determining remoteness "in the light of the particular facts of each case ...", one method being *"evidence showing a lack of reformation ..."* (emphasis supplied) Fundamental concerns of fairness require us to construe the alternative method to exclude *controverted* issues of fact which are unadjudicated at the time of trial.

Thus, in the instant case, while the trial court properly considered uncontroverted evidence of Caulder's flight from South Carolina in making his decision to admit the remote prior convictions, the court also erroneously considered evidence of the highly contested issue regarding the witness's participation in an illegal "kick-back" scheme in Florida. Without any other intervening acts of misconduct, the evidence of flight ten years prior to trial is simply not enough to show unreformed character at the time of trial. We are therefore constrained to hold the trial court erred in admitting evidence of Caulder's prior convictions.

However, we have also examined the record before us and find beyond a reasonable doubt that the error did not contribute to either appellant's conviction or his sentence. Tex.R.App.P. 81(b)(2), supra. The effect of the evidence of Caulder's prior forgery convictions was to place before the jury his credibility as an alibi witness. If that were the only evidence offered to rebut the defensive theory, the error in admitting the impeachment evidence might call for reversal of the cause. However, our attention is also directed to other evidence, both controverted and uncontroverted, which was before the jury on the issues of appellant's guilt and in rebuttal to his defensive theory. Before Caulder was improperly impeached, the state had introduced into evidence other statements, notably those of July 31st, August 2nd and November 10th, in which appellant directly implicated himself in the crime and refuted the defensive theory. In his February 16, 1984, interview, appellant further related how the "kick-back" system worked. That evidence was supported by Kenneth Emery's testimony to the effect that the "kick-back" practice was a normal part of the job Caulder was entrusted to supervise. Finally, the work records introduced by the defense facially reflected appellant to have been present on the Florida job site on dates surrounding the murder but not specifically on the date the crime was calculated to have occurred. Add to this evidence testimony that appellant would disappear from work for days at a time and that roll was not regularly called on the job site, and the improper impeachment of the witness loses importance. Given the above evidence, we can say beyond a reasonable doubt that the evidence complained of did not contribute to the verdict or sentence assessed in the case. Tex.R.App.P. 81(b)(2), supra. *See also Lott*, supra. Point of error number seven is overruled.

In point of error number eight appellant claims trial court error in the admission of extraneous offenses contained in appellant's audiotaped confession of July 31, 1983. The State first introduced an edited version of the confession before the jury. The defense then played a re-edited version

of the tape, after which the State moved to play an even more detailed variant. A hearing was held outside the jury's presence on the matter and after some deletions by the trial court the State was allowed to play the tape for the panel.

Appellant objected to admission of the tape at trial, as on appeal, on the basis that portions of the tape made "implied references to extraneous offenses committed by Appellant." In response, the State argues the additional portions of the tape were admissible under Art. 38.24, V.A.C.C.P., in effect at time of trial.[10] Art. 38.24 read as follows:

> When part of an act, declaration or conversation or writing is given in evidence by one party, *the whole* on the same subject may be inquired into by the other, as when a letter is read, all letters on the same subject between the same parties may be given. When a detailed act, declaration, conversation or writing is given in evidence, any other act, declaration, conversation or writing which is necessary to make it fully understood or to explain the same may also be given in evidence. (Emphasis added)

Specifically, the State asserts the additional portions of the tape, while perhaps inadmissible during the State's case-in-chief, became admissible under Art. 38.24, supra, and this Court's opinions when appellant "opened the door" by introducing portions of the tape which had the effect of confusing the jury. We pause to note that it is well established that evidence used to explain a matter opened up by another party need not be ordinarily admissible. *See Parr v. State*, 557 S.W.2d 99 (Tex.Cr.App.1977); *Burns v. State*, 556 S.W.2d 270 (Tex.Cr.App.1977); *Lucas v. State*, 479 S.W.2d 314 (Tex.Cr.App.1972).

The sequence of events leading up to the introduction of the taped portions objected to by the defense is as follows. The State initially offered an edited version of appellant's statement wherein he confessed to the crime. The defense then re-edited the tape, adding portions of the confession to show "the confession was not as clear and unambiguous as it appeared in the State's original version. The portions appellant introduced reflected that Appellant was sometimes unsure of the facts of the alleged capital murder, and also showed that Appellant was assisted in constructing his narrative by Sheriff Jim Boutwell." Based on these additions, the State then sought to admit further portions of the taped confession to "show *why* [appellant] had a problem creating a narrative, namely: the confusingly similiar offenses he'd committed."

In *Roman v. State*, 503 S.W.2d 252 (Tex.Cr.App.1974), this Court discussed the purpose behind Art. 38.24, supra:

> The purpose of this provision is to reduce the possibility of the fact finder receiving a false impression from hearing the evidence of only a part of the conversation, writing, act or declaration. The theory behind the rule is that by allowing the jury to hear the rest of the conversation on the same subject the whole picture will be filled out, removing any misleading effect which may have occurred from introduction of only a portion of the conversation.

503 S.W.2d at 253. The Court went on to admonish the reader that the rule encompasses only additional portions on the same subject; it is impermissible to rely upon the rule as authority for the introduction of unrelated subject matter.

Our review of the record in the instant case shows the State introduced a severely-edited version of the confession which clearly set out appellant's culpability in the murder. The apparent defense strategy was to introduce additional select portions of the tape highlighting appellant's confusion as to details of the offense and Boutwell's assistance in prodding appellant's memory for those details. Appellant now argues the tape demonstrates the "truth" of his "confusion", and claims further that the State's "introduction of a theory of multiple murder in an attempt to explain Appellant's confession does nothing to correct a false impression. Any impres-

---

**10.** Now see Tex.R.App.P. 107 which mirrors the language in old Art. 38.24. The only addition under the new rule is to specifically include depositions as a written or recorded statement.

sion that appellant is confused is a true one." We agree with appellant's last statement but not the premise of his argument. Just as appellant was entitled to show he was confused as to the details of his crime at the time the statement was taken, so too was the State entitled to show the source of that confusion. Contrary to the position taken by appellant on appeal, we cannot say the additional statements objected to at trial are not "any other act, declaration, conversation or writing which is necessary to make it fully understood or to explain the same"; nor do we find that the statements do not "reduce the possibility of the fact-finder receiving a false impression." Art. 38.24, supra; *Roman,* supra. It would have left the jury with a false impression if appellant had successfully kept the additional portions of the statement from the jury, because the impression one is left with after a rendition of the defense-edited version is that an individual without concrete knowledge of the incident is "led" to confess by the prompting of an officer of the law. This impression is false since appellant makes clear on the tape it is not his innocence of the crime nor the method of questioning by Boutwell that causes the confusion, but his involvement with a large number of people, places and dates so that the particular facts in question are jumbled in his mind with facts and circumstances of other undefined but implied criminal encounters. Since the defense raised the question of confusion in the context of the confessions, a question going to the ultimate issue in the case, it was proper for the State to clarify and explain appellant's apparent confusion in terms of the confession as a whole. We therefore hold appellant "opened the door" on the issue by attempting to paint an incomplete picture of the July 31st confession, and under Art. 38.24, supra, the State was permitted to complete the picture. *Brandley v. State,* 691 S.W.2d 699 (Tex.Cr.App.1985). *See also Wintters v. State,* 616 S.W.2d 197 (Tex.Cr.App.1981); *Parr,* supra; *Young v. State,* 488 S.W.2d 92 (Tex.Cr.App.1972) and cases there cited. *Cf. Roman,* supra; *Allen v. State,* 493 S.W.2d 515 (Tex.Cr.App. 1973); *Willeford v. State,* 489 S.W.2d 292

(Tex.Cr.App.1973). The point of error is overruled.

In point of error nine, appellant claims error in the admission of his August 2, 1983, crime-scene videotaped confession for the reason that he appeared on film before the jury in handcuffs, in violation of his right to the presumption of innocence, to a fair trial and to due process of law. Admitting he has no authority to support this claim, appellant nevertheless suggests the same reasoning pertaining to the use of restraints in the courtroom before the jury should also apply to a videotaped interview taken with an accused outside the courthouse and later played for the jury at trial. In response, the State asserts the circumstances here do not support the same rationale as that used in courtroom situations, and in any event, no reversible error occurred.

■■■ It is now axiomatic that requiring a defendant to wear handcuffs before the jury at trial infringes his constitutional presumption of innocence. *Marquez v. State,* 725 S.W.2d 217 (Tex.Cr.App.1987) and cases cited therein; *Clark v. State,* 717 S.W.2d 910 (Tex.Cr.App.1986); *Moore v. State,* 535 S.W.2d 357 (Tex.Cr.App.1976). The only exceptions to the prohibition during trial are where it is shown on the record of the proceedings that there are "exceptional circumstances" or a "manifest need" for such restraint, *Cline v. State,* 463 S.W.2d 441 (Tex.Cr.App.1971); *Gray v. State,* 99 Tex.Cr.R. 305, 268 S.W. 941 (Tex. Cr.App.1924); or where the encounter is away from the courtroom and is "momentary, inadvertent and fortuitous" in nature. *Clark,* supra.

The instant case presents a different scenario. Here, the record does not reflect, and appellant does not suggest, that he was made to appear before the jury in handcuffs or that the jury was allowed to see his physical presence during trial under restraint. However, it cannot be doubted appellant was brought "into the view" of the jury panel while handcuffed. *See Mouton v. State,* 235 S.W.2d 645 (Tex.Cr.App. 1951).

A review of prior opinions of this Court reveals the issue before us to be an uncommon problem at best. The case coming closest on point is that of *Mouton, supra,* where a similar argument was made to the introduction of still photos of the accused at the crime scene in handcuffs. Summarizing both the general rule and exceptions thereto, the Court went on to note this Court "has declined to order reversal even in death penalty cases, on the ground that the accused was brought into the presence of the jury handcuffed, in the absence of a showing of injury or prejudice to the accused." *Id.* at 651. The Court reasoned if an impression were left with the jury, it would be that in the opinion of the officers accompanying the accused, the accused was not to be trusted under their control without restraint. Given the accused had already made a written confession and his only defense was a claim of insanity, the Court found evidence of prejudice or injury insufficient to reverse the conviction and sentence of death.

■ We initially note the *Mouton* Court grappled with the issue of admission of the photographs not only in the sense of an improper encounter between the accused and jury, but also within the evidentiary framework of the old common law rule which banned admission of photographs into evidence if the pictures were gruesome or might tend to inflame the minds of the jury, unless the pictures tended to solve a disputed fact issue. *See Mouton v. State,* 236 S.W.2d 499 (Tex.Cr.App.1951) (on second motion for rehearing). *See also Burns v. State,* 388 S.W.2d 690 (Tex.Cr.App.1965). That standard evolved but remained basically unchanged until this Court, on rehearing in the case of *Martin v. State,* 475 S.W.2d 265 (Tex.Cr.App.1972), overruled the *Burns* standard and held that a competent, material and relevant photograph is not rendered inadmissible due to the nature of its contents or possible impact on the jury, unless it is offered "solely to inflame the minds of the jury." *Id.* at 267. The standard today, of course, is if a verbal description of the scene depicted in the photograph would be admissible, a photograph depicting the same content is also admissible. *Id.* *See also Jackson v. State,* 745 S.W.2d 4 (Tex.Cr.App.1988); *Losada v. State,* 721 S.W.2d 305 (Tex.Cr.App.1986).

■ Given the context of the issue in *Mouton, supra,* that court found error in admission of the photographs but held the error to not have injured or prejudiced the accused due to the circumstances of that case. In the present case, in contrast, we do not find error in admission of the videotape *as evidence in the case, see* discussion under point of error number ten, *infra.* However, where the State chooses to introduce into evidence before the jury a videotaped statement made by an accused, and the statement is used during the first stage of trial, before a verdict as to guilt or innocence is reached by the jury, the State must observe the rule guarding the presumption as in other cases where the physical presence of the accused in view of the jury must be unfettered or unrestrained. To find otherwise would be to discount the constitutional presumption of innocence in favor of strictly evidentiary concerns. The courts have recognized that the presence of physical restraints on an accused may tend to prejudice the jury against the accused and suggest that the trial judge, by permitting the use of such restraints, has thereby expressed the opinion that the accused is a dangerous person and is not to be trusted. *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); *Mouton, supra; Gray, supra.* While it is true appellant was not brought in before the jury during trial in restraints, the jury was allowed to see by videotaped means that which would not otherwise have been permitted. Although there is a distinction, it is one without a difference if the broad presumption is to be supported. Therefore, unless the record reflects "good and sufficient reason for such extraordinary measures," *see Walthall v. State,* 505 S.W.2d 898 (Tex.Cr.App.1974), we must find error in the admission of the videotape.

Neither party can point to any instance of actual misconduct or threat made by appellant which would provide an exception to the rule in this case. And, the fact that

the State did not subsequently move to try appellant in restraints merely underscores the error. We may agree it was both necessary and practical to handcuff appellant while on the side of a busy roadway, especially given his admissions to heinous and violent activity in the past; however, error will occur in such a situation not because of the content of an accused's statement but due to the visual impact of the improper picture of a restrained defendant upon the mind of the jury. *See and cf. Reyes v. State,* 579 S.W.2d 927 (Tex.Cr.App.1979) (mug shot taken subsequent to arrest properly admitted but better practice is to remove police markings before picture shown to jury) with *Richardson v. State,* 536 S.W.2d 221 (Tex.Cr.App.1976) (prior mug shot indicating extraneous offense held prejudicial error). *See also Huerta v. State,* 390 S.W.2d 770 (Tex.Cr.App.1965) (introduction of mug shot not error where all identification marks showing police source were removed).

As in *Mouton,* supra, here we also find error in admission of that part of the video portion of the tape depicting appellant in handcuffs. In the strictest sense, given the lack of any evidence to the contrary, we are presented with an instance of an unintentional, but erroneous, encounter before the jury, an encounter of more than slight duration. However, a finding of error will not mandate reversal unless we find "injury" or "prejudice" per *Mouton,* supra; under today's rules that necessitates a harmless error analysis under our rules of appellate review. *See* Tex.R.App.P. 81(b)(2).

█ Rule 81(b)(2), supra, states where error is found in the trial proceedings below, the conviction or sentence must be reversed unless it is determined beyond a reasonable doubt the error made no contribution to the conviction or punishment. *Id.* Here, the record reflects appellant willingly participated in the filming of the confession which ultimately led to filing of the capital charge against him. A review of the videotape demonstrates clearly and succinctly, through appellant's own words after being advised in the strongest terms by his own attorney not to speak at all, that appellant

freely admitted culpability of the offense and was quite cooperative in not only confessing but also acting out his crime for the benefit of camera and the State's case against him. The focus of the tape is not on appellant's hands but on his statements concerning his actions the day of the murder.

Moreover, as in *Mouton,* supra, the prejudice or injury to appellant diminished due to the admission of a prior confession. Although appellant may have provided more facts in the August 2, 1983, interview, it must be remembered that appellant had already confessed to the actual killing, if not all the circumstances surrounding the incident, over a month before the videotape was made. Furthermore, we can find no harm in the jury's view of a handcuffed accused where the contact occurs simultaneously with the accused's voluntary, detailed descriptive confession of guilt at the scene of the crime. We stress the fact that appellant, over the most strenuous of warnings by counsel present on the scene, unequivocally made known his intention to disregard those warnings and to further implicate himself in the matter through the medium of videotape. The impression given the jury, if any, was of a minimally restrained individual who was then freely confessing to a murderous act while moving about on the shoulder of a busy interstate highway. In contrast, appellant appeared without handcuffs during the trial itself. Given the contextual atmosphere in which the jury was allowed to view the handcuffed appellant, one in which by wholly voluntary admission the facts and circumstances of the crime were discussed and re-enacted by the accused, the fact the jury was instructed as to the presumption of innocence, and the fact that irregardless of his repeated confessions, the presumption was underscored by his unfettered appearance in the courtroom, we can say beyond a reasonable doubt the "encounter" made no contribution to appellant's conviction. Further, given the overwhelming evidence presented in the punishment stage of trial, we now determine by the same standard that the error made no contribution to the punishment assessed in the case. In so

holding, we do not extend the rule or its exceptions; in each such situation the circumstances of the individual case must be examined to determine whether the post-arrest encounter constitutes harmless error.[11] Appellant's ninth point of error is overruled.

In a related point of error, appellant argues the crime scene videotape was erroneously admitted because the State failed to satisfy the predicate requirement for admission of the tape under Article 38.-22(3)(a), V.A.C.C.P., that all voices heard on the tape recording be identified. Appellant's specific complaint goes to allegations that the voices of other individuals outside the range of the camera were not identified prior to admission of the tape. The State asserts that all voices were identified.

■ Inasmuch as videotapes are a simultaneous audio and visual recording of events, a predicate is required to establish their accuracy and reliability. *Roy v. State*, 608 S.W.2d 645 (Tex.Cr.App.1980). The Court in *Roy*, supra, adopted the seven-prong test enunciated in *Edwards v. State*, 551 S.W.2d 731 (Tex.Cr.App.1977), originally applied to sound recordings, for videotape technology, and stated that the narrow requirements pertaining to the admission of other mechanically acquired evidence could be somewhat relaxed when testing the admissibility of a videotape recording, just as the *Edwards* court had relaxed the requirements for certain sound recordings:

> Although videotapes are motion pictures as well as sound recordings, we now hold that the *Edwards* predicate applies to videotapes. Moreover, because of the dual aspect of videotapes they convey a greater sense of reliability than either film or sound tapes standing alone and

> *at least some of the Edwards elements may also be inferred from the testimony.*

*Roy,* supra at 649. (Emphasis supplied).

■ Similiar to subsection 3(a)(4) of Art. 38.22, supra, one of the seven prongs of the *Edwards* test requires the speakers on the recording be identified.[12] In both pre-trial proceedings and in hearings held outside the presence of the jury during trial, there was testimony identifying the parties who directly participated in the road-scene videotape in relation to other voices audible on the recording. It was established that Boutwell, appellant, Deputy Weeks and attorney Don Higginbotham were present and were the actual participants in the videotaped interview. It was also established that there were other individuals near the scene who took no part in the taping of the statement or who otherwise participated during the proceedings on August 2, 1983. Our review of the recording shows a myriad of background noise either identified as traffic noise or as voices from persons not involved in the actual taping procedure. Recognizing the true measure of review of the admissibility of a recording is its accuracy and reliability, *see Roy,* supra, we have reviewed the tape and find no error in its admission. We did not find, nor has appellant alluded to, any particular instance where appellant suffered injury or was open to the possibility of harm due to the presence of any "speaker" on the videotape whose voice was not identified. In this context, we distinguish between one who actively contributes to the videotaped recording from one whose voice is in the background and whose comments have no material relevance to the taped interview. Where all the actors who are speaking are visible to

---

11. In a very recent case, the Eleventh Circuit Court of Appeals grappled with the very same problem raised at bar. In *Gates v. Zant,* 863 F.2d 1492 (11th Cir.1989), the court held that a "brief viewing" of a handcuffed defendant in a videotaped confession by the jury, while rebutting the presumption of innocence, did not require reversal absent a showing of "actual prejudice."

12. In order for a recording to be admissible under *Edwards,* the following must be shown by the party seeking to introduce the recording: (1) the recording device was capable of taking testimony, (2) the operator was competent, (3) the recording is both authentic and correct, (4) no changes, additions or deletions have been made, (5) the manner in which the recording was preserved, (6) *identification of the speakers,* (7) the testimony was voluntarily made without any kind of inducement.

the viewer, at one time or another, as here, and where there is no instance of an off-camera actor interjecting or attempting to interject comments directly pertaining to the statement or discussion in question, we cannot say any individual's voice remains "unidentified" for purposes of Art. 38.22 or the *Edwards* test for admissibility. The purpose of the predicate having been met by this Court's finding that the videotape in question was accurate and reliable, no error is shown. *See Roy*, supra. The point of error is overruled.

Appellant's eleventh point of error concerns the second videotape made on August 2, 1983, in the Sheriff's office in Williamson County. Again, he complains that voices heard in the background were not identified. Again, we must disagree. The record reflects Sheriff Boutwell identified the background voices as coming from a radio monitor in the office. As in point number ten, discussed supra, such background noise, not shown to have impacted in any manner upon the recording at issue, does not affect the accuracy or reliability of the recording so as to require that the statement be suppressed. There being no error in admission of the videotape, the point of error is overruled. *Roy*, supra. *See generally Edwards*, supra.

Point of error twelve contains the same claims regarding unidentified voices in the November 10, 1983, audiotape. As earlier noted, this audio-tape was made in Sheriff Boutwell's car as he drove appellant from Denton to Georgetown and concerned appellant's statements relating to Mack Caulder having taken kickbacks to falsify time sheets. Boutwell testified the extraneous voices heard on the tape came from his two-way radio, not from anyone who participated in the interview. For the same reasons enunciated *ante*, we hold the recording was properly admitted. The extraneous voices were identified as coming from a particular source outside the scope of the conversation between the sheriff and appellant. It was not shown or even intimated that the voices had anything to do with the statements being taped. As in appellant's earlier points, it is suggested,

without corresponding authority, the predicate for admission was not met since the State did not specifically identify the complained-of voices, but only identified the *source* of the voices. Given the fact the voices were extraneous to the conversation and did not affect the accuracy or reliability of the statements made by appellant, we hold as above that the identification by source was sufficient to establish the predicate for admission. To decide otherwise would be to ignore the purpose of the rule. *See Roy*, supra; *Edwards*, supra. Appellant's twelfth point of error is overruled.

Point of error number thirteen also concerns appellant's audiotaped statement of November 10, 1983. Under this point, appellant claims the predicate was not met under subsection 3(a)(3) of Art. 38.22, supra, which requires, prior to the admission into evidence of an oral custodial statement against an accused, that the recording must reflect "the accused was advised before the interrogation that the interrogation will be recorded". *Id.* Here, appellant contends he was never "advised" that a recording was to be made. More specifically, appellant says Art. 38.22, supra, "should be read to require more than an assumption on the part of the interrogator that the accused is aware of the recording device; the interrogator must affirmatively advise the accused that a recording is being made." We are directed to our opinion in *Ragan v. State*, 642 S.W.2d 489 (Tex.Cr. App.1982) as authority for that proposition.

In *Ragan*, supra, an individual was arrested for drunk driving after he recklessly drove through an intersection in which an accident had occurred, almost striking a police officer as well as the vehicles involved in the accident. After placing the man in a patrol car, the arresting officer turned on a tape recorder and began questioning him. This Court held the tape was improperly admitted into evidence over that appellant's objection that the State did not satisfy the predicate requiring the individual be warned *during* the recording that a recording was being made.

In contrast to *Ragan*, supra, here appellant was adequately warned his statement

would be recorded. While it is true Sheriff Boutwell did not formally give a warning *per se*, it is also true that the sheriff, before taking the statement, advised appellant:

> Ok, I'm going to hand you this, uh, recorder, and if you will, keep it up pretty close to your mouth so, uh, the car noise won't drown your voice out, and I'm going to ask you a ... a few questions.

■ The clear meaning of the statute is to ensure the accuracy and reliability of oral statements elicited from a person who has been arrested and is undergoing custodial interrogation. *See Roy*, supra; *Ragan*, supra. Where a person is aware his statements are being recorded, it is reasonable to place greater weight upon the reliability and accuracy of such statements, since the person is making the statement with knowledge that his comments will be preserved as he made them. In the converse, where a statement is recorded in a surreptitious manner, without proper authorization, one may logically question the reliability and accuracy of the recording due to the unsupervised method in which the recording was obtained.

■ In reviewing the tape recording, it is clear appellant was aware the conversation was being taped. While it is true the sheriff did not explicitly *warn* appellant the conversation was to be recorded, such a warning is not required by the statute. What is required is that the recording must reflect the appellant was *advised* of the fact the sheriff intended to record the conversation before actual questioning began. While it may be the better practice to specifically advise an accused of this fact, given the facts in this particular case we cannot say the recording failed to show appellant was advised the interrogation would be recorded. The recording reflects appellant was told he would be handed the recording apparatus and was advised to keep the apparatus close to his mouth so outside noise would not drown out his voice. Given these facts, we do not see how appellant may now logically complain he was not properly advised the conversation was to

be recorded. The point of error is overruled.

In his fourteenth point of error, appellant complains his due process rights were violated by the admission into evidence of a videotaped statement he made during a February 16, 1984, interview with Sheriff Boutwell in which he says that in return for all or part of a paycheck, Florida work records would be falsified to show an employee was present and working on a particular job. Appellant points to an order drafted by defense counsel and signed by the trial judge prohibiting law enforcement agents from interrogating appellant concerning the instant offense and further requiring appellant's attorneys be notified before interrogation occurred on any other offense appellant was not then presently under indictment for in Williamson County.

The record reflects a defense motion was filed in this case to prohibit any and all questioning of appellant during his stay in Williamson County. The motion was heard and argued on November 14, 1983. Testimony was elicited from Boutwell and appellant, both of whom agreed appellant was voluntarily cooperating with law enforcement officials regarding the resolution of extraneous, previously unsolved crimes. Appellant, in response to questioning by the court regarding whether he wanted to have counsel present at such interrogations, made clear his feelings on the matter:

> No, sir. I didn't start this in June to have an attorney present. When I started it, I told them what my decision was. I have been fighting attorneys ever since it happened and I have been fighting law officials ever since it happened to be able to testify that I did do a crime, and I don't feel it's—since I have done the crimes, I don't feel it's right for myself to deny that. I have done those crimes. Simply because another person says, no, you can't do that, I mean, if I've done a crime, then I am the one that has got to pay. Nobody else. Nobody else has got to pay with their life except me and I have been dead for 23 years. So, as far as admitting to crimes that I haven't

done, I don't do that and I have only admitted to my own crimes.

After carefully questioning appellant concerning his understanding of his *Miranda* rights and his feelings on the matter, the trial court denied the defense motion which would act as a blanket prohibition of all questioning, but asked that the defense attorney:

... draft an order which states that the Defendant is not to discuss this case that is presently under indictment in Williamson County, which he has stated he is not going to and he's not to be interrogated about the case he's presently under indictment in Williamson County, and the Court is going to order the Sheriff's Office to notify, even though Mr. Lucas has stated here in court that he doesn't want his lawyers present when he's making statements or talking to other officers, in order for them to properly defend Mr. Lucas. They feel it is necessary that they at least know who he is talking to, so as he makes statements and talks to law enforcement officers, I want (defense attorneys) informed that he is going to talk to somebody and make a statement and then if they want to be present, they may be present if the lawyers choose to be present.

Such an order was subsequently drafted and signed by the trial judge on November 21, 1983.

Appellant attacks admission of the statement on two fronts. First, he contends the February, 1984 interrogation was improper because it dealt with matters "pertaining to the instant case." Second, even if the questioning avoided matters pertaining to the case under indictment, Sheriff Boutwell was required to notify appellant's attorneys before questioning began, which he failed to do. Although appellant's argument is multifarious, we will review each argument in the interest of justice.

The order signed by the trial judge reads in pertinent part:

IT IS hereby ordered that the Defendant may be interrogated or questioned by law enforcement officers only if he consents to said interrogation, and only after the Sheriff of Williamson County, Texas has advised the attorneys for the Defendant herein that he is to be interrogated.

IT IS FURTHER ORDERED that the defendant is not to be interrogated by anyone concerning the offense for which he has been indicted herein.

■ The order plainly states that officers could question appellant about matters other than the *offense* for which he stood indicted, to wit, the offense at bar. Appellant argues a more expansive construction of the order, saying the order prevented questioning of any matter "pertaining to the instant *case.*" While at first blush any difference may appear to be a matter of semantics, we think the language used in the order clearly distinguishes questioning about the facts or circumstances of the offense from other collaterally related circumstances regarding appellant's conduct over an extended period of time. Officers were prevented from interrogating appellant about the facts of the offense itself, but the order does not state, nor does the record reflect, that it was designed to prevent proper police investigation of other unsolved matters. While it may be true that appellant's work history and circumstances surrounding his alleged presence or absence from work over a period of time correlating with the time of the murder "pertained" to the case, the nexus is not with the circumstances of the offense itself but with appellant's choice of defense strategy to rebut the charge after the State had concluded it's case-in-chief. Unquestionably, the facts concerning appellant's work history also "pertained" to extraneous and previously unsolved matters then being investigated by police agencies from around the country, with appellant's full cooperation. Our review of the statement in question shows no mention of facts "concerning the offense" for which appellant stood indicted, either in violation of the pre-trial order or in conflict with the intent of the trial court as reflected by the transcript of the hearing on appellant's motion.

Also of concern is whether the State, through its agents, abided by the order of

the trial court to advise the attorneys appointed to represent appellant that appellant would be interrogated on February 16, 1984. The record reflects defense attorneys were indeed notified of future interrogations on a daily basis for a period of time after the order was signed. It also shows his attorneys decided at some point to no longer attend the interrogations. Neither of appellant's trial attorneys could state positively whether they were or were not informed of the February 16th meeting. However, one attorney testified he agreed with Sheriff Boutwell at some point that no future notice need be given except for the instant offense, for which interrogation had already been banned by order of the trial court.

■ From the above facts it is clear appellant's attorneys, even over appellant's own stated desire not to have counsel present, were indeed notified of future interrogations for some uncertain period of time after the order was entered. The record does not affirmatively reflect, through the testimony of any witness on either side, that the order was violated. Indeed, there is some indication if the terms were not strictly met as to notification, the order was modified by agreement of the parties, as argued by the State. It must be remembered the instant cause does not present a case where law enforcement officials were enticing or otherwise coercing a suspect to make a statement or incriminate himself. The record reflects the trial court, before requesting the order be drafted, questioned appellant at length regarding his willingness to talk with police about other unsolved incidents. Appellant repeatedly stated it was his desire to continue the discussions, without benefit of counsel. It was not unreasonable under these particular facts for appointed counsel to agree to modify the order, if such was the case. We do not find appellant's due process rights were violated either by the taking of the statement or by its admission. Appellant's fourteenth point of error is overruled.

In his fifteenth point of error appellant complains the trial court erred in failing to file as part of the record on appeal the findings of fact and conclusions of law on the confession issues raised at the pre-trial hearing.

Article 38.22(6), V.A.C.C.P., requires a trial court to determine the voluntariness of an accused's statement whenever the issue is raised, and where the court has determined the statement is admissible as a matter of law and fact, the court must enter an order stating its specific findings and conclusions made therefrom; the order to be filed in the record.

■ The trial court filed with the Clerk of this Court his findings of fact and conclusions of law on August 20, 1987. The order reflects findings and conclusions concerning appellant's statements of June 22, 1983; July 28, 1983; July 31, 1983; August 2, 1983; November 10, 1983; and February 16, 1984; as well as findings and conclusions upholding appellant's original arrest for possession of a firearm by a felon. Therefore, since the trial court's findings of fact and conclusions of law have been supplemented into the record before us, any error has been cured and appellant is entitled to no further relief. *Garrett v. State,* 682 S.W.2d 301 (Tex.Cr.App.1984). *Cf. Dykes v. State,* 649 S.W.2d 633 (Tex.Cr.App.1983); *Bonham v. State,* 644 S.W.2d 5 (Tex.Cr.App.1983). Appellant's fifteenth point of error is overruled.

In point of error sixteen appellant contends the trial court erred in refusing to instruct the jury on the voluntariness of his confessions. The requested instruction reads as follows:

You are instructed that if you believe from the evidence or have a reasonable doubt thereof that at the time the Defendant made the alleged confession in evidence before you, if he did, said Defendant was under the influence of drugs or some substance of past or recent usage, if he was, and therefore was not in possession of his mental faculties to the extent that he could

1) Knowingly and intelligently waive his right to remain silent, and

2) Waive his right to have a lawyer present to advise him prior to any questioning, and

3) Waive his right to terminate the interview at any time.

You will not consider said alleged confession or statement or any evidence derived therefrom for any purpose whatsoever.

The crux of appellant's argument is that the evidence showed he was of low average or low normal range intelligence, was a residual chronic schizophrenic, had difficulty following lengthy or complex instructions, would "flip-flop" in thinking and behavior leading to his alternately attempting to please and confuse authority figures, had difficulty with short-term memory, and had been heavily sedated with Thorazine and certain tranquilizers during the period in which he was cooperating with law enforcement officials. Appellant concludes by asserting the jury could have found his ability to make a knowing and intelligent waiver of his rights was affected by medications he was given during this time period, and under Art. 38.22(7), supra, the requested instruction should have been given.

▆▆ We first pause to point out appellant is not claiming the trial court should have instructed the jury regarding alleged inherent mental subnormality suffered by appellant. His requested instruction asked for a fact-finding and blanket limitation based upon the effect of drugs appellant was prescribed during incarceration upon his decision to cooperate with authorities in solving the previously unsolved murder. Therefore, before he would be entitled to such an instruction, the record must show from some source not just the fact the medication was prescribed, but also that the drugs would have the claimed effect. Appellant contends his expert witness testimony provided such an opinion.

A review of the testimony in the case not only fails to support appellant's contention; it directly refutes the claim. Austin Psychologist Dr. Tom Kubiszyn's testimony is instructive. Called by the Defense, he testified that Thorazine, an antipsychotic drug, is one of a class of chemical compounds that have proven to be very effective in the treatment of psychotic disorders, including schizophrenia. The schizophrenic individual often has great difficulty organizing his or her thinking and perceiving accurately reality. The effect of the Thorazine is that it helps to clarify for the individual thought processes, helps in organizing, in a sense helps that individual deal more effectively with reality.

The effect of the medication given appellant, Dr. Kubiszyn agreed, was to make appellant "less crazy." While it is true Kubiszyn diagnosed appellant as suffering from a mental disease, he also found appellant to be more cognizant because of the medication. Kubiszyn found appellant to have an approximate IQ of 84, with reading skills of almost a seventh grade level. At no time did the doctor opine the medication caused a *loss* of faculties; to the contrary, all his testimony on the subject showed the positive influence the drugs had on appellant's ability to deal with reality.

Psychiatrist Jay Fogelman, also called as a defense witness, testified as to the effects of Thorazine on the treated individual. Dr. Fogelman explained the drug worked in the central nervous system in the brain of an individual suffering from schizophrenia to block excess amounts of chemicals which travel from one nerve cell in the brain to another through the synapse, or point at which a nervous impulse passes between neurons. Because the excess amount of the debilitating chemical is controlled, the psychotic symptoms "get much better".

Nothing in either witnesses' testimony raised the issue whether medication may have caused appellant to lose control of his mental faculties to the point he would be unable to knowingly and intelligently undertake the course of cooperative conduct he chose to follow after his arrest in Montague County. Nor does appellant point to any other evidence from which it may reasonably be deduced that the prescribed medication had any such effect. Moreover, our review of the taped statements in the

case does not reflect any such evidence; to the contrary, appellant appears and sounds rational, thorough and persistent in his desire to confess his criminal conduct. We find appellant failed to prove his alleged mental subnormality, allegedly caused by the prescribed medication, existed as a matter of fact so as to require an instruction for the jury. *See generally Bell v. State,* 582 S.W.2d 800 (Tex.Cr.App.1979); *Rogers v. State,* 549 S.W.2d 726 (Tex.Cr.App.1977); *Casias v. State,* 452 S.W.2d 483 (Tex.Cr. App.1970). Appellant not being entitled to the instruction, there is no error. The sixteenth point of error is overruled.

In his seventeenth point of error appellant claims his June 22, 1983, written statement was the product of an illegal arrest and was admitted into evidence in violation of his rights under the Fourth Amendment, Art. I § 9 of the Texas Constitution, and under Arts. 1.06 and 38.23, V.A.C.C.P.

At a pretrial hearing on appellant's Second Motion to Suppress his otherwise voluntary statements given to Sheriff Boutwell, testimony was heard regarding appellant's arrest at the compound belonging to the House of Prayer in Montague County. The record reflects affidavits were filed by Reverend Ruben R. Moore and Fay Munnerlyn stating appellant had a pistol in his possession in the "Cook Shack" at the House of Prayer and had given the gun to Moore, who in turn asked Munnerlyn to take the gun elsewhere. Sheriff Conway filed a complaint based upon this fact and the fact appellant had previously been convicted of a felony involving an act of violence. The complaint charged appellant with the crime of unlawful possession of a firearm by a felon. V.T.C.A., Penal Code, § 46.05.[13] Appellant asserts on appeal, as he did in his pretrial motion, that the complaint is insufficient to support the warrant subsequently issued for his arrest because neither affidavit supporting the complaint alleged a specific place of possession *"away from the premises where he lived."* Thus, appellant asserts, Sheriff Conway made the allegations in the complaint "with a knowing and deliberate falsehood" as to

the necessary element of location of possession, in direct violation of *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d. 667 (1978) (intentional abuses of warrant process, including deliberate falsehoods alleged in affidavit, as grounds for reversal).

As appellant points out, Moore's affidavit states no specific location, but says that appellant "came to me and was leaving" when appellant gave him the gun. Moore goes on to say he gave the gun to Faye Munnerlyn. Munnerlyn's affidavit gives the location where Moore was given the gun as "the Cook Shack at the House of Prayer Church in Stoneburg." Conway's sworn complaint plainly states the affiants saw appellant in possession of the gun at a place away from the premises where he lived. Thus, as appellant ultimately contends, the question to be resolved is whether Conway knew the information was false as to the element of location, in violation of *Franks v. Delaware,* supra. Put simply, the validity of appellant's claim lies in the question of whether the sheriff had knowledge whether the "Cook Shack" was part of appellant's "premises" for purpose of the statute proscribing such possessory conduct.

At the pretrial hearing on the motion to suppress, while being cross-examined by defense counsel regarding the complaint and affidavits, Conway was asked how he knew the "Cook Shack" was "away from the premises" of appellant. The sheriff responded:

> It was away from his house. It was at the coffee shop where everyone goes. The church people and everybody goes (sic) to the coffee shop, where he brought it to him.

A short time later Conway was asked whether he had inquired of Moore and Munnerlyn as to the "premises":

> (Q) Did you ask them about the, about the premises?
>
> (A) Ask—
>
> (Q) Ask Rueban and Fay Moore (sic)?

13. See footnote 1, *ante.*

(A) Yes, I asked them where he gave it to them, and if I recall right, they said at the coffee shop, at their coffee shop there at the church. And it is not—the building is not attached to the building where he lives, and it's a public place and a road between them.

The sheriff went on in more detail to describe the House of Prayer compound and testimony was elicited that he was well acquainted with the area, having made several trips out to the church to talk with appellant.

■ The term "premises" and phrase "premises where he lives" are not expressly defined in the Texas Penal Code. However, the obvious intent of the statute proscribing possession of firearms by convicted felons is to keep violent offenders from going about with firearms. *Sheppard v. State,* 586 S.W.2d 500 (Tex.Cr.App.1979). Because they have demonstrated a propensity toward violence, the State has a rational basis on which to restrict their possession of firearms in order to protect the general public. *Milligan v. State,* 554 S.W.2d 192 (Tex.Cr.App.1977). By statute, convicted felons are not entitled to possess a firearm except where they "live", within the meaning and intent of the statute.

The record reflects the area of the compound included a central building, the church and "Cook Shack"; flanked by unconnected outbuildings, some of which were revitalized chicken houses. Parking areas separated the main building from the other structures. Appellant and other individuals lived in the outbuildings, but along with other church members, shared the communal facilities of the "Cook Shack" or "Coffee Shop." Thus, it appears his residency was more in the nature of a tenant than an owner, such as Reuben Moore, whose "own premises" *would* conceivably cover the whole area as a "place of business." *See Lattimore v. State,* 145 S.W. 588 (Tex.Cr.App.1912). *See also generally Roy v. State,* 552 S.W.2d 827 (Tex.Cr.App. 1977).

■ Given the above knowledge held by the sheriff at the time the complaint was sworn out, we cannot agree with appellant that Conway knowingly and deliberately included falsehoods within the complaint by alleging appellant possessed the weapon away from his own premises. To an observer, appellant's residence, separated as it was from the "Cook Shack," would not logically appear to be part of his premises. And, indeed, given the tenancy arrangements at the compound, the "Cook Shack" was not part of appellant's "premises" as that term is understood in the jurisprudence of this state, but was a common area or "public place" for the use of *all* church members and residents. *See Melton v. State,* 508 S.W.2d 104 (Tex.Cr.App.1974) (defendant carried pistol downstairs into public area of apartment complex); *Bryant v. State,* 508 S.W.2d 103 (Tex.Cr.App.1974) (tenant of apartment complex seen with pistol in parking lot was not on own premises); *Wilson v. State,* 418 S.W.2d 687 (Tex.Cr.App.1967) (tenant who carried pistol upon grass, sidewalks, driveway, and parking lot jointly used by all tenants was not on own premises).

We also find that the facts in the affidavits and allegations in the complaint, although of a "bare-bones" variety, gave the magistrate who signed the warrant sufficient information to believe a crime had been committed. The affidavits clearly identified the location of possession as the "Cook Shack," which, although not specifically named in the complaint, was by common definition as a public place "away from the premises" of appellant. The arrest being proper, the alleged "illegal fruit" of the arrest—the June 22nd confession—was also properly admitted.[14] We, therefore, overrule appellant's challenges of constitutional and statutory error under this seventeenth point.

Appellant contends in his last point of error the trial court erred in refusing a

---

**14.** Appellant also complains that the June 22nd confession was a tainted product of a statement he gave on June 15th regarding the Montague County offense. That argument is premised upon our finding an invalid arrest, as discussed *ante.* The June 15th statement was not introduced into evidence before the jury.

requested charge on special issue number three at the penalty phase of trial. The record reflects at the close of the evidentiary phase of trial, a conference was held concerning the charge to be given the jury. At this time, appellant objected to the failure of the trial court to include within the charge an instruction pursuant to Art. 37.-071(b)(3), V.A.C.C.P. That subsection states:

(3) *if raised by the evidence*, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased. (Emphasis supplied)

The record before us provides a complete picture of the events leading up to the murder in appellant's own words. According to appellant, "Jane Doe" refused to have sex with him a second time and she tried to jump out of the moving car. Appellant then grabbed her and thwarted her escape attempt. True, the young woman "fought" him, grabbing the steering wheel and attempting to escape his grasp. The appellant would have this Court hold such conduct, since it "jeopardized" appellant's life by "the likelihood of an automobile wreck caused by the deceased," was provocation sufficient to warrant the requested instruction. This we decline to do. Although the evidence showed the deceased struggled to escape appellant, there was no evidence her conduct was of such a nature so as to incite appellant to violence as a result of that conduct. Nor is our attention directed to any other evidence tending to show appellant's ultimate act was "incited" by any conduct of the victim. To the

contrary, the evidence, all of which was derived from appellant's own statements, reflects appellant never intended to release his victim alive; his act in killing the deceased was not one of passion but of calculation.

 In order to raise the issue of provocation, it is necessary there be evidence of the deceased's conduct just prior to death and that evidence must be sufficient to be considered provocation. *Hernandez v. State*, 643 S.W.2d 397 (Tex.Cr. App.1983). The third special issue, like the second special issue under Art. 37.071, supra, has been construed as permitting the jury to consider particularized mitigating circumstances. *Evans v. State*, 601 S.W.2d 943 (Tex.Cr.App.1980). Here, as the facts recited above demonstrate, there were no sufficiently provocative acts by the deceased to raise the issue. *See and* compare *Evans*, supra, at 946 (victim's act in pointing and firing pistol at defendant sufficient provocation). The trial court did not err in refusing to submit the requested instruction. Appellant's last point of error is overruled.

The judgment is affirmed.

McCORMICK, P.J., and CLINTON, J., concurs in the result.

TEAGUE, J., dissents to the disposition made of points of error numbers 1–7, 9, 13, 14, and 17.

APPENDIX

# Brotherton, Maxfield & Tompkins
## ATTORNEYS AT LAW

Robert P. Brotherton
Donald E. Maxfield
T. Daniel Tompkins

P.O. Box 2078 · 809 Indiana
Wichita Falls, TX 76307
817/761-2211

June 22, 1983

Sheriff W.F. Conway
Sheriff's Office
Montague, Texas 76251

Re: Inmate—Henry Lee Lucas
Charge—Murder

Dear Sheriff Conway:

On June 21, 1983, Judge Frank Douthitt appointed me to represent Henry Lee Lucas who is presently in your custody. I understand that my client has been interviewed by law enforcement officers and attorneys for the State concerning various conduct.

I hereby serve you notice that my client does not consent to any interview with any law enforcement officer or attorney for the State from this date forward, without my presence at such interview. Any attempt at an interview with my client without my presence is in direct violation of my client's constitutional and statutory rights and your department will be held directly responsible for any such violation of my client's rights.

My client invokes his 5th Amendment right to remain silent and does not knowingly, intentionally, or intelligently waive his right to remain silent.

My client invokes his 6th Amendment right to have his attorney present before any interviews or other procedures or proceedings take place, and does not knowingly, intentionally, or intelligently waive such rights.

I will ask for your cooperation on these matters so that none of my client's rights are violated while in your custody.

Very truly yours,

/s/

Donald E. Maxfield

DEM: jp

cc: Judge Frank Douthitt
 Mr. Jack McGaughey