**Opinion issued November 29, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-15-00966-CR

———————————

**SAM AUTRY FLETCHER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 183rd District Court**
**Harris County, Texas**
**Trial Court Case No. 1369730**

---

## MEMORANDUM OPINION

Appellant Sam Autry Fletcher appeals his conviction for aggravated robbery. The State requests that we reform the written judgment to reflect appellant's plea of "true," and the trial court's implicit finding of "true," to appellant's prior conviction for purposes of punishment enhancement. We modify

the judgment as the State requests—which brings the written judgment in conformity with the record of the sentencing hearing—and otherwise affirm the judgment.

**A. The Robbery**

On December 1, 2012, Hugo Iguirre picked up his wife Ivette from her night job, and they then went to Ivette's brother's house—where they were staying the night—arriving about 3:30 a.m. A small, white SUV sped up and parked behind them. Ivette believed the vehicle to be a Dodge Nitro or similar model. Four or five men jumped out carrying rifles and claiming to be police. The men were wearing masks, dark clothes and shoes, and police-raid vests. Hugo and Ivette were both struck in the head with guns, and the men threatened to kill them both.

One man then told Ivette to unlock the door to her brother's house. They then woke up Ivette's brother, Luis Villanueva, and his wife Yaneth. Luis testified that, when he woke up to his sister coming into his bedroom, he got up and someone punched him. Luis then saw someone holding his sister at gunpoint with a handgun. Luis testified to seeing at least three men in their bedroom. One was very tall, about 7 feet. Another was around Luis's height of 6 feet. Luis believed from their voices that they were both African American. The third was a little shorter, a little huskier, and spoke with a Hispanic accent. Yaneth testified it was

2

too dark for her to see anyone, but she heard her husband get hit, and they were both then taken into the living room.

The Villanuevas and Aguirres were ordered to lie face down on the living room floor, their hands and feet were bound, and they were repeatedly kicked by the intruders. Yaneth testified that she heard four different male voices that she did not recognize; she believed two were Hispanic and two were African American. She also described the four as wearing masks, dark clothes, dark shoes, and police-raid vests. Like her husband, she noticed one of the men was very tall with a large shape. The man who had put a gun to her head was shorter and somewhat heavy. The others were thin. Luis noticed two additional men later in the burglary.

The intruders ransacked the house, opened Christmas presents, and searched for any valuable items. The family was in fear for their lives, as the intruders threatened to throw gasoline on them and burn them alive, but it turned out they were only carrying water, not gasoline.

After the intruders beat and kicked Luis again, they took Yaneth into the bathroom. She told the intruders that she had $27,000 cash in her closet. In addition to taking that money, the intruders took her wedding ring, a Play Station game console, games, other jewelry, and the money out of the Villanuevas' daughter's piggy bank.

After spending about 45 minutes in the apartment, the intruders untied Luis and took him with them, telling the others that they were doing so as insurance that they would not call the police. After they left, Ivette managed to untie herself, and then untied Yaneth and Hugo. They immediately called the police.

In the meantime, Luis was held at gunpoint on the floor of his own truck while another man drove the truck. After about ten minutes, the men jumped out and untied Luis's hands. The men fled and Luis drove his truck back home, arriving around the same time as the police.

## B. Appellant's Apprehension

At 4:45 a.m. that same day, M. Haver, a constable deputy, was dispatched to the home invasion. She spotted what looked like a white Dodge Nitro matching the description of the vehicle that had been broadcast. When she passed the vehicle going the opposite direction, she spotlighted the SUV and at least four people inside the vehicle turned to look at her. She testified that at least three of them were dark skinned, either African American or dark Hispanic. She radioed dispatch and a nearby unit to report that she had located the suspect vehicle. As Haver started to follow the SUV, the driver sped up and tried to evade her. At one point, Deputy Constable P. Gennua picked up the pursuit. Haver was able to keep the SUV and Gennua's vehicle in her sight at all times. When the SUV stopped on a dead-end street, the driver put it in reverse and all the occupants jumped out as it

4

rolled backwards into a parked car. The occupants fled on foot into a wooded area. Given how dark the area was, Haver was not able to tell the number of people who fled, nor could he identify their ethnicity.

Two K-9 officers arrived and tracked the woods, but their dogs lost the suspects' scents at a set of railroad tracks. C. Marshall, one of the K-9 constable deputies, was called out again, however, after a suspect was located at a nearby rail yard.

Mr. S. Davis, a locomotive engineer with the Union Pacific Railroad, testified that one morning—while he was tying up his locomotive—he was approached by a young man wearing all black. He immediately called his supervisor to report it because the person was trespassing on federal property. Davis provided in-court identification of appellant, testifying that appellant was the person who approached him in the rail yard.

Appellant asked Davis for directions to Interstate 45. Appellant then offered Davis first $10, and then $100 if Davis would drive him to Interstate 45. Davis sent appellant to a safer area of the rail yard, and then called 911 to tell officers where to locate appellant.

Marshall was dispatched to the rail yard, and his dog eventually indicated that it had picked up a suspect's scent. Marshall then spotted a figure in all black hiding behind a tree in some vegetation. When Marshall ordered the suspect to

5

show his hands and got no response, he sent his dog in for apprehension. Marshall explained that process involves the dog grabbing a suspect at one spot and not letting go until an officer approaches. Another officer, Lieutenant Glaze, reached the suspect first and handcuffed him. Marshall then called off his dog. Marshall provided in-court identification of appellant as the suspect that they apprehended near the rail yard.

Marshall testified that he called EMS, as is procedure whenever a dog detains a suspect by biting. While the officers were walking appellant back to their cars, appellant asked for some water. Appellant told Marshall that he was running because he had seen a police helicopter and a police car and that it was the most he had ever run in his life.

Marshall and Glaze then handed off appellant to Sergeant Garza and Lieutenant W. Schultz.

### C. Crime Scene Investigation

Harris County Sheriff's Department Sergeant L. Holliday testified that he was the crime scene investigator for the December 1, 2012 burglary and kidnapping incident at the Villanuevas' home.

He first processed the home, finding it in disarray. Electronics were unplugged and stacked on the living room floor, items were strewn out of closets, and drawers from the dressers and nightstands had been dumped upside down on

6

the bed in the master bedroom. Holliday was left with the impression that the house had been thoroughly ransacked. He swabbed some blood-looking spots for DNA, and processed for fingerprints. Moving outside to examine Luis's truck and the area around it, Holliday discovered adhesive tape with hair stuck in it crumpled up in the foliage.

When Holliday next arrived at the secondary crime scene where the white SUV was abandoned, he located a black glove on the ground. Appellant had been taken back to that scene, so Holliday photographed him, as he appeared to have blood on his clothing. Appellant told a different officer that he was six feet, six inches tall. When asked about the blood on him, appellant claimed it was his own blood. Holliday took appellant's clothing into evidence, which included black colored baggy sweatpants, a white-colored muscle shirt, a black shirt, and black tennis shoes. Appellant also had his wallet and $5,900 cash in his possession when he was arrested. That cash was split into bundles and wrapped in small rubber bands.

Holliday also processed the white SUV, a Jeep Liberty. In it, he found (1) a pillowcase (in a pattern he recognized from the Villanueva's household) containing a PlayStation game console and cell phone, (2) a couple of bullet-proof vests with the words "Police" on them, (3) a gold-colored badge labeled "Bounty Hunter," (4) a bandana, (5) a walkie talkie, (6) a pistol-style shotgun, (7) baseball caps labeled

7

"Narcotics," "Police," and "Sheriff," (8) a brown purse containing a HandyCam Camcorder, two male wallets (one containing Luis Villanueva's driver's license) and one female wallet (containing Yaneth Villanueva's driver's license), (9) duct tape, (10) a crowbar, (11) a revolver, (12) a pack of Newport cigarettes, (13) a glove, (14) another cell phone, and (15) cash tied together in bundles.

Holliday asked Deputy Wyatt if he knew appellant's cell phone number, and Wyatt indicated that he did. Holliday then asked Wyatt to call appellant's phone number, and Wyatt's call rang through to one of the cell phones Holliday found in the SUV.

### D. Appellant's Statement

Deputy Wyatt conducted a taped interview of appellant. Appellant initially denied any involvement, despite having admitted already that he was running from the police. He later changed his story twice.

He continued to deny being at the Villanuevas' house, but he admitted that he had agreed to meet someone in the cul-de-sac and drive a vehicle for $350. He brought the bandana found in the Jeep to wipe the steering wheel clean because he did not like to leave his fingerprints anywhere.

Appellant stated that he waited much longer than expected, but the white Jeep he was waiting for finally showed up. It drove into the cul-de-sac with police in pursuit. When the Jeep stopped and its occupants jumped out, appellant said he

8

looked inside and saw bundles of cash held together with small pink and black rubber bands that he assumed were drug-house proceeds. He took some of the money, dropping his cell phone in the Jeep in the process. He then ran into the same wooded area as the men who had fled the Jeep.

He admitted knowing that any situation in which was being paid $350 to drive a vehicle was not completely legitimate. He stated his stipulations for driving the SUV were (1) it not be stolen, (2) it be registered, (3) it not have drugs in it, and (4) the men previously driving it had not used it to kill anyone. He explained that the man who hired him to drive the vehicle often liked to quickly change out the car he drove in case he was being followed because of his drug dealing activities.

Appellant then changed his story again, but continued to maintain that he had neither participated in any robbery, nor had he been to the Villanuevas' house. He claimed some Mexican men he did not know picked him up in a black Dodge SUV, then took him to a side street around 3:00 a.m. and parked. Later, a little gray car pulled up behind them. The driver of the Dodge spoke into a walkie talkie to the person in the gray car. Thirty or forty minutes later, the white Jeep pulled up with a gray pickup truck behind it. Appellant got into the white Jeep, and the other occupants were talking about how someone would be calling the police.

9

Appellant claims that no one was left behind in the gray pickup truck. According to appellant, five people were in the Jeep, and he described the police vests the other men had with them and the guns they carried. He admitted to taking a significant amount of cash, because one of the other men had dropped it in the Jeep and no one was paying attention. Appellant described the police pursuit of the Jeep, and how he and all the other occupants jumped out of the Jeep and fled into the woods.

### E. The Jury's Verdict, the Trial Court's Judgment, and Appellant's Motion for New Trial

The Jury found appellant guilty of aggravated robbery. The punishment phase was to the court. The State introduced evidence of appellant's prior convictions for aggravated assault of a police officer, unauthorized use of a motor vehicle, illegal license or certificate, and armed bank robbery. Appellant introduced sealed mitigating evidence. The court sentenced appellant to 55 years' confinement.

Appellant filed a motion for new trial on the following grounds: (1) "The verdict was decided in a manner that was not a fair expression of the jurors' opinion," (2) "The jury verdict of guilty was against the weight of the law and the evidence," and (3) "Witnesses exist whose testimony could have established the innocence of Defendant, [but] . . . were not called by trial counsel." In addition to affidavits attached to the motion for new trial, the trial court took evidence and

10

testimony at a motion for new trial hearing.  Ultimately, the trial court denied the motion, and appellant timely brought this appeal.

## ISSUES ON APPEAL

Appellant's brief presents the following issues for our review:

I.    "Appellant moved to suppress the audio recording of his interview with the deputy sheriff on the ground that he had asked to speak to a lawyer. Miranda requires that custodial interrogation must cease once the right to counsel has been invoked. However, the deputy sheriff continued the interview for a period of two hours. By the officer's testimony, Appellant reasonably believed he was not free to leave. His request for a lawyer was not promptly honored. Admission of his statement was not harmless error even though there was other evidence linking him to the crime."

II.   "Appellant sought to impeach the credibility of Yaneth Villanueva by questioning her about the possibly illicit source of the money she had hidden in her closet and about her claiming of Medicare benefits to which she was not entitled. The court granted the State's motion in limine on the ground that such questioning would amount to improper impeachment. The confrontation clause of the United States Constitution secures a defendant's right to cross-examination to establish a witness' bias, prejudice, or lack of credibility. The court's ruling deprived Appellant of this right."

III.  "Appellant filed a motion for new trial on the ground that the jury verdict had been less than unanimous. A juror had said the guilty verdict was not hers when first polled, then said it was her verdict after further deliberation. Appellant offered witnesses to show the juror had been coerced by other jurors. Their testimony was excluded on grounds of hearsay and Rule 606(b), TEX. R. EVID. However, during trial the court had questioned the juror because she seemed inattentive and unable to follow the testimony. Coupled with evidence presented at the new trial hearing that the juror suffered from continuing mental confusion, the court should have found that she had not been a competent juror and hence granted a new trial."

IV.   "The evidence was not legally sufficient to prove Appellant guilty of aggravated robbery beyond a reasonable doubt. The witnesses did not identify him and there was no direct evidence of his presence at the crime scene.  Similarly, the evidence showed merely that Appellant had driven the

11

getaway car. No evidence was offered to show that he had knowingly entered into an agreement to assist the other suspects in committing an aggravated robbery."

The State, by cross-point, requests "that this Court will reform the judgment and sentence in this cause to reflect that appellant pled true to the enhancement and that the trial court found it true," to conform the written judgment to the record.

## MOTION TO SUPPRESS

Appellant filed a pre-trial motion to suppress his statements to police. In his motion, he specifically argued that the statements were (1) unconstitutionally taken while he was in custody, (2) made in violation of his right to have counsel present after he did not voluntarily waive that right, and (3) made without the safeguards required by article 38.22 of the Texas Code of Criminal Procedure. After the trial court listened to the recording of the police's interrogation of appellant, it denied appellant's motion, ruling his statements admissible.

### A. Applicable Law and Standard of Review

"The Fifth Amendment prohibits the government from compelling a criminal suspect to bear witness against himself." *Pecina v. State*, 361 S.W.3d 68, 75 (Tex. Crim. App. 2012) (citing U.S. CONST. amend V ("No person . . . shall be compelled in any criminal case to be a witness against himself.")). In *Miranda v. Arizona*, the Supreme Court crafted safeguards to protect this "privilege against self-incrimination" in the inherently coercive atmosphere of custodial

interrogations. 384 U.S. 436, 441, 86 S. Ct. 694, 106 (1966). "Before questioning a suspect who is in custody, police must give that person *Miranda* warnings." *Pecina*, 361 S.W.3d at 75. "Only if the person voluntarily and intelligently waives his *Miranda* rights, including the right to have an attorney present during questioning, may his statement be introduced into evidence against him at trial." *Id.*

Once a suspect invokes the right to counsel, "all interrogation by the police must cease until counsel is provided or until the suspect himself re-initiates conversation." *Dinkins v. State*, 894 S.W.2d 330, 350 (Tex. Crim. App. 1995) (citing *Minnick v. Mississippi*, 498 U.S. 146, 153, 111 S. Ct. 486, 491 (1990)). "The right to counsel is considered invoked where a person indicates he or she desires to speak to an attorney or have an attorney present during questioning." *Lucas v. State*, 791 S.W.2d 35, 45 (Tex. Crim. App. 1989). "An invocation must be clear and unambiguous; the mere mention of the word 'attorney' or 'lawyer' without more, does not automatically invoke the right to counsel." *Dinkins*, 894 S.W.2d at 351; *Robinson v. State*, 851 S.W.2d 216, 223 (Tex. Crim. App. 1991).

"A trial court's ruling on a motion to suppress lies within the discretion of the court." *Reed v. State*, 227 S.W.3d 111, 115 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (citing *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996)). "A trial court abuses its discretion if it refuses to suppress evidence that is

obtained in violation of the law and that is, therefore, inadmissible." *Erdman v. State*, 861 S.W.2d 890, 893 (Tex. Crim. App. 1993).

**B. Analysis**

In his first point of error, appellant contends that the trial court's denying his motion to suppress was erroneous because police disregarded his invocation of his right to have a lawyer present during their taped custodial interrogation of him. Moreover, he insists that the trial court's error was not harmless, as no eyewitness placed him at the scene of the robbery, and the circumstantial evidence against him was weak.

The State responds that the trial court's ruling was correct because appellant knowingly waived the right to have an attorney present. Our review of the recorded interview supports the State's assertion.

At the beginning of appellant's taped interview, appellant stated that he knew his *Miranda* rights. The officer nonetheless explained each *Miranda* right— including the right to have a lawyer present during questioning, the right to terminate the interview at any time, and the right to have a lawyer appointed if appellant could not afford to hire one. The officer also stopped after articulating each right to verify that appellant fully understood.

Appellant asked "would it be cool" if they got a lawyer on the phone. The officer explained that would not work, as there would be no way to verify that the

person on the phone was a lawyer, and explained again that if appellant wanted to speak to a lawyer or have a lawyer present for any questioning, the interview would stop right then. The officer reminded appellant that the decision was up to him. Appellant then asked what he would get out of participating in an interview, and the officer explained that it was appellant's opportunity to tell his side of what happened.

The conversation was interrupted by a phone call that came in for the officer. When he returned, the following colloquy occurred:

Q. Do you want a lawyer or do you want to talk? It's up to you.
A. I want to talk to you right now.
Q. Do you want a lawyer?
A. No, I don't want my attorney here.
Q. You are waiving your right to have a lawyer?
A. Yeah, I want to talk.

In *Reed*, we held that a defendant asking whether he could get a lawyer if he wanted one was not a clear invocation of his right to have counsel present during questioning. 227 S.W.3d at 115. In holding that the trial court did not abuse its discretion in denying the defendant's motion to suppress his statement in that case, we explained our obligation to look at the totality of the circumstances in assessing if a waiver is voluntary and unequivocal:

> Once an accused has invoked his right to counsel, all interrogation by the police must stop until counsel is provided or until the accused himself initiates contact with police. *Dinkins*, 894 S.W.2d

15

at 350 (citing *Minnick v. Mississippi*, 498 U.S. 146, 153, 111 S. Ct. 486, 491, 112 L. Ed.2d 489 (1990)). When an accused's invocation is unclear, ambiguous, or equivocal, the interrogating officers are not required to automatically stop the interview. *Lucas*, 791 S.W.2d at 46. They may continue questioning the accused, but only to ascertain whether he wishes to speak to an attorney or continue the questioning without the assistance of counsel. *Id.* Police may not use such clarification as a guise to encourage, coerce, or intimidate the accused to make a statement. *Jamail v. State*, 787 S.W.2d 372, 377 (Tex. Crim. App. 1990).

In reviewing an alleged invocation of the right to counsel, a reviewing court must look at the totality of the circumstances surrounding the interrogation and alleged invocation to determine whether an accused's statement can be construed as an actual invocation of the right. *Dinkins*, 894 S.W.2d at 351. The inquiry is an objective one: whether a reasonable officer, under similar circumstances, would have understood the statement to be a request for an attorney or merely one that might be invoking the right to counsel. *Id.*

When the right to counsel has been invoked, it may be later waived, either expressly or through the actions of the accused. *Lucas*, 791 S.W.2d at 46. Such a waiver must be (1) knowing, intelligent, and voluntary and (2) the product of contact initiated by the accused. *Lucas*, 791 S.W.2d at 46 (citing *Smith v. Illinois*, 469 U.S. 91, 95, 105 S. Ct. 490, 492, 83 L. Ed.2d 488 (1984)).

*Id.* at 115–16.  Here, the closest appellant came to invoking his right to a lawyer was asking if it would "be cool" if they got a lawyer on the phone to listen to the interview.  This was not a clear, unequivocal invocation of the right to have an attorney present.  Thus, consistent with our instructions in *Reed*, the officer continued the interview, but confined his questions to ascertaining "whether he wishe[d] to speak to an attorney or continue the questioning without the assistance

16

of counsel." *Id*. at 115.  At that point, appellant expressly waived his right to have counsel present.

Finally, appellant contends that introduction of his statement violated article 38.22 of the Texas Code of Criminal Procedure, which governs the admissibility of a defendant's recorded statements.  Although he does not articulate how this article was allegedly violated, we need not attempt to glean the basis for this argument, as he did not object to admission of the statement at trial.  In fact, his attorney stated he had no objection to its admission, subject to agreed-upon redactions.  *See, e.g.*, *Rosales v. State*, 335 S.W.3d 284, 287–88 (Tex. App.—San Antonio 2010, pet. ref'd) ("In order to preserve error for review, an objection that the statement was taken in violation of section 38.22 must be specifically made . . . . Here, because Rosales affirmatively stated he did not have an objection to the entry of the oral statement, we conclude that he has waived his right to complain.").

Because we conclude that the trial court did not abuse its discretion in denying appellant's motion to suppress, we overrule appellant's first point of error.

## ADMISSION OF EVIDENCE

Prior to trial, the State served appellant with a *Brady v. Maryland*[1] disclosure, about the "financial status of the complaining witness."  Specifically,

---

[1]     373 U.S. 83, 87, 83 S. Ct. 1194, 1196–97 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process

17

the notice stated that: "The victims in this case saved $30,000 by cashing a portion of their checks to keep separate from their bank accounts and made no disclosure to the State. This was done so that they could continue to receive State benefits." The trial court granted the State's motion in limine on this topic, requiring the parties to approach the judge before mentioning to the jury "the source of the money stolen from the complainants' house in this case."

At a pretrial hearing, appellant argued that the source of the money was relevant because it was kept in a way (i.e., tied with hair bands) that is consistent with drug-dealing proceeds, and that—if the complainants were committing Medicare fraud—the fact they were hiding money goes to their character and truthfulness. The State countered that it did not intend to go into the source of the money, and that the source of the money would not be a proper subject of impeachment. The State conceded that the veracity of the truthfulness of the complaining witnesses was an issue at trial. The State insisted, however, that if appellant wanted to impugn the credibility of the complainants, he could do so by calling witnesses that could testify that the complainants had a reputation for being untruthful or drug dealers, but that evidence about specific bad acts was not admissible as character evidence. The court agreed, stating that it would be improper as impeachment evidence.

where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

During cross-examination of Yaneth, appellant's counsel questioned her about both her and her husband's work history. When counsel asked her if they "were receiving any Government assistance during the time" that they were both working, the State objected to relevance, which the court sustained. Outside the presence of the jury, appellant argued that he should be able to broach the subject of the source of the stolen money because she made prior inconsistent statements to different district attorneys. The trial court allowed a Bill of Review:

> [APPELLANT'S ATTORNEY]: Your Honor, at this time I would like to make a Bill of Review regarding the State's Motion in Limine. This witness has testified that she has consistently told the District Attorneys the same particular thing. We have a pending Motion in Limine that acts -- which this Court has ruled upon prohibiting me from going into the source of the particular money. She's already testified she's told everybody the same thing. I would like to put on the record her testimony as to what she said and where the inconsistencies are because I believe it should come into evidence.
>
> THE COURT: You may proceed.
>
> Q. Okay. Now, Ms. Villanueva, you talked to an investigator the night it happened; isn't that correct?
>
> A. That morning, yes, sir.
>
> Q. All right. And since then you've talked to three different District Attorneys, have you not?
>
> A. Yes, sir.
>
> Q. And you've -- and it's your testimony that you've told all of them the same particular thing; is that correct?
>
> A. Yes, sir.
>
> Q. Okay. I was given notice on money [sic] that you had informed [State's attorney] that the source of this particular money was from you working, but you were not putting your money in the

19

bank as to receive -- to continue receiving State benefits; is that correct?

A. Yes, sir.

Q. Did you tell all the -- the other two prior District Attorneys the same thing?

A. I don't remember mentioning it.

Q. You don't remember mentioning it. So, you did not tell them that?

A. I might have. I'm not sure.

Q. Okay. All right. But you're certain you told [State's attorney] that?

A. Yes, sir.

Q. And you told him that after he had pressed you repeatedly as to the source of these particular funds; is that correct?

A. Can you repeat?

Q. You told him that once he repeatedly pressed as to where you got the $30,000 from; is that correct?

A. I don't understand your question.

Q. All right. Initially you didn't tell anybody that you were saving this particular money so you could continue to receive State benefits; is that correct?

A. I'm not sure if I mentioned it to the detectives. I'm not sure.

Q. Okay. And you're not sure if you mentioned it to the District Attorney?

A. The other attorneys didn't ask me.

Q. They didn't ask. And you didn't volunteer it either, did you?

A. No, sir.

Q. Okay. So, it''s safe to assume you didn't tell anybody about this until [State's attorney]?

A.    Yes, sir.

Q. Of course, you knew what you were doing was to circumvent the system so you could continue receiving State benefits; is that correct?

A. Yes, sir.

. . . .

Q. And you did that knowing that had you put the money in the bank or reported the income, you would not be eligible to receive these State benefits; is that correct?

A. Yes, sir.

Q. Okay. All right. And again, you finally made this revelation to [State's attorney] on Monday, was it, of this week?

A. I'm not sure when we met. I can't remember when we met.

Q. So, you can't remember if you met with [State's attorney] this week or last week; is that correct?

A. I think it was -- it was last week.

Q. So, it was last week. What day last week was it?

A. Thursday.

Q. Thursday. Okay. All right. And are you continuing to receive State benefits?

A. No, sir.

Q. Okay. All right. But at the time that you were saving this particular money, you were receiving these benefits and you knew had you reported the particular income, you wouldn't be eligible to receive these benefits; is that correct?

A. Yes, sir.

. . . .

REDIRECT EXAMINATION

[STATE'S ATTORNEY]. You didn't recall anybody ever asking you that question of why you had $30,000?

A. I remember the detectives asked me, but I can't remember if I mentioned that.

Q. Okay.

21

A. It had just happened. So, I was --

Q. The first District Attorney, whoever asked you where the money came from, was me? That you can remember?

A. That I can remember, yes.

. . . .

RECROSS-EXAMINATION

[APPELLANT'S ATTORNEY]: And when you spoke to the detective when you first gave a statement -- well, let me ask you this first: Did your husband know that you had this money?

A. He knew we had money. He didn't know how much.

Q. Okay. And didn't, in fact, you tell this detective that your husband didn't even know you had the money? Didn't you tell him that?

A. No. I told him he knew we had money, but he didn't know the amount.

Q. Okay. So, you never told the detective that no one, not even your husband knew about the money?

A. No, sir.

## A. Applicable Law and Standard of Review

The general rule is that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." TEX. R. EVID. 404(b)(1). "In a criminal case, subject to the limitations in Rule 412 [limiting evidence about sexual assault victim's prior conduct], a defendant may offer evidence of a victim's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it." *Id*. 404(a)(3)(A). "Any party, including the party that called the witness, may attack the witness's credibility." *Id*. 607.

22

"Except for a criminal conviction under Rule 609 [allowing impeachment by evidence of certain criminal convictions], a party may not inquire into or offer extrinsic evidence to prove specific instances of the witness's conduct in order to attack or support the witness's character for truthfulness." *Id.* 608. Rather, "[w]hen evidence of a person's character or character trait is admissible, it may be proved by testimony about the person's reputation or by testimony in the form of an opinion." *Id.* 405(a)(1). If such evidence is admissible and admitted, "[o]n cross-examination of the character witness, inquiry may be made into relevant specific instances of the person's conduct." *Id.* "When a person's character or character trait is an essential element of a charge, claim, or defense, the character or trait may also be proved by relevant specific instances of the person's conduct." *Id.* 405(b).

"Irrelevant evidence is not admissible." *Id.* 402. "Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." *Id.* 401. A court may exclude even relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice [or] confusing the issues." *Id.* 403.

The trial court is given wide latitude to admit or exclude evidence of extraneous offenses. *See Montgomery v. State*, 810 S.W.2d 372, 390 (Tex. Crim.

App. 1990); *Poole v. State*, 974 S.W.2d 897, 897 (Tex. App.—Austin 1998, pet. ref'd). A reviewing court must therefore recognize that the trial court is in a superior position to gauge the impact of the relevant evidence and not reverse a trial court's ruling if it is within the "zone of reasonable disagreement." *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999); *Montgomery*, 810 S.W.2d at 391.

Absent exclusion of evidence that amounts to a constitutional error that prevents a defendant from effectively presenting a defense, erroneous exclusion of evidence is subject to harm analysis under Rule 44.2(b) of the Texas Rules of Appellate Procedure. *Ray v. State*, 178 S.W.3d 833, 836 (Tex. Crim. App. 2005). "When evaluating harm from non-constitutional error flowing from the exclusion of relevant evidence, we examine the record as a whole, and if we are fairly assured that the error did not influence the jury or had but a slight effect, we conclude that the error was harmless." *Id.* (citing *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000)).

**B. Analysis**

In his second point of error, appellant complains that the trial court's exclusion of evidence related to the source of the Villanuevas' money and why it was kept in their home was an abuse of discretion. Specifically, appellant argues that the source of the stolen funds and the apparent fraud on Medicaid were

24

relevant to impeaching the credibility of the Villanuevas. He contends that the purpose of this line of inquiry was to demonstrate that Yaneth had committed fraud and then made conflicting statements to prosecutors to conceal what she had done. In addition, appellant asserts that Yaneth's accumulation of the money at issue made it likely that the Villanuevas were involved in drug trafficking. According to appellant, "[q]uestioning the Villanuevas about possible criminal activity could have shown that they had powerful motives to shade their testimony: to curry favor with law enforcement, portray themselves as victims, and fend off prosecution for Medicaid fraud and possible drug trafficking." *See Davis v. Alaska*, 415 U.S. 308, 94 S. Ct. 1105 (1974) (cross-examination of witness about probation status was permissible because it could show that the probation gave the witness a motive to help the police and shift suspicion away from himself). Finally, appellant claims he was harmed by this limiting of cross-examination because Yaneth "was the only witness who could testify to the amount of the money and the only witness who could say that the cash was bound in hairbands," given that the money found on appellant was also bound in hairbands.

The State notes that appellant was able to ask a testifying officer about whether the Villanuevas' money was bound in a way consistent with drug-dealing operations. The officer agreed, and said it was also similar to how money is kept by convenience stores and other places with large amounts of money. The State

25

also argues that the evidence was neither relevant, nor proper impeachment or character evidence. We agree with the State.

First, neither the source of the money stolen from the Villanuevas nor their hiding money from Medicaid satisfies the relevancy test on the facts of this case. No one disputes that the aggravated robbery took place. The only issue to be proven at trial was *who* committed that robbery. The source of the stolen money or other bad acts by the Villanuevas did not make it more or less likely that appellant was the perpetrator of the crime with which he was charged.

Likewise, the evidence was not proper impeachment evidence. Appellant claimed that the line of questioning about the source of the money was relevant to impeachment because Yaneth allegedly "made conflicting statements to prosecutors to conceal what she had done." Yaneth's testimony during the bill of review, however, does not support this assertion. She did not recall making any earlier statement to any district attorney about the source of the funds.

The fact that the Villanuevas did not identify appellant as a participant in the robbery renders appellant's argument—*i.e.*, that they had "powerful motives to shade their testimony: to curry favor with law enforcement, portray themselves as victims, and fend off prosecution for Medicaid fraud and possible drug trafficking"—unpersuasive. Implicit in this argument is that Yaneth had a motive to lie about being robbed, as that is the only thing she testified about. But even

26

appellant's theory of the case did not dispute that the robbery took place, so we do not agree that allowing appellant to cross-examine Yaneth about the source of the stolen money would have revealed a motive to lie about any relevant facts she testified about. And other courts have affirmed the exclusion of similar evidence in the face of defendants' argument that a complainant's status as a drug dealer or a complainant's motive to curry favor with police was relevant to character and impeachment. *See, e.g.*, *Hoyos v. State*, 951 S.W.2d 503, 507 (Tex. App.— Houston [14th Dist.] 1997), *aff'd* 982 S.W.2d 419 (Tex. Crim. App. 1998) (holding trial court properly denied request to cross-examine the complainant regarding her reputation as a drug dealer to show she was robbed by someone else who knew about her proceeds or to confront her claiming she was in a vulnerable position because of her daughter's dismissed drug charge because the evidence was irrelevant and would confuse the issues); *Oville v. State*, No. 03-98-00382-CR, 1999 WL 298319, at *2 (Tex. App. —Austin May 13, 1999, no pet.) (mem. op., not designated for publication) (holding evidence that complainants were drug users and dealers was not relevant or admissible in defense of robbery because "[t]he taking of [the complainants'] property at knife point was still aggravated robbery, even assuming their possession of the property was unlawful").

For many of the same reasons that we have held the source of the stolen money and alleged Medicare fraud is not relevant, we conclude that the exclusion

27

of this evidence was not harmful to appellant. Two other witnesses testified to the same matters Yaneth did, i.e., details of the robbery. Appellant makes much of the fact that Yaneth testified that the stolen money was bundled in hairbands, which matches how the money found on appellant's person was bundled. But a crime-scene investigator testified to finding money in the get-away vehicle bundled in hairbands. All of the other evidence implicating appellant came from the physical evidence and appellant's own statements, not Yaneth's testimony. Appellant's phone was found in the same vehicle as the Villanuevas' wallets and other items taken from their home. Appellant's story was that he was only in the get-away car, but that he did not participate in the robbery. The matters about which appellant wanted to cross-examine Yaneth were unrelated to the question of whether appellant participated in the robbery or only found out about it and became involved after the fact. Thus, appellant cannot show that exclusion of this evidence influenced the jury. *Ray*, 178 S.W.3d at 836.

We overrule appellant's second point of error.

### JURY'S VERDICT

Appellant filed a motion for new trial, arguing that the "verdict was decided in a manner that was not a fair expression of the jurors' opinion." In support, the motion stated:

> A juror, when polled, stated that the guilty verdict was not her verdict. The jury resumed deliberation and again returned a guilty verdict. The

28

same juror entered the courtroom and said that the guilty verdict was not her verdict. She said that she had been coerced by the other jurors to agree to a guilty verdict.

Dorothy Hunt (appellant's mother) and Jeremy Engel (a friend of appellant's) wrote letters to the trial court in support of this assertion. Both letters stated that Juror Number 1 came into the courtroom after the jury was dismissed and said that she was bothered by what had happened, she disagreed with the verdict, but she was nonetheless pressured by the jury foreman to convict appellant.

Hunt and Engel were called as witnesses at the Motion for New Trial hearing, but the court sustained objections to their testimony on the basis of hearsay. The court allowed appellant's attorney to make the following bill of review about what Hunt and Engel would have testified to if allowed:

> Mr. Engel states that he observed the trial and was deeply disturbed at what he witnessed following the conclusion of the trial after the Court had passed sentence. Mr. Engel would say that when initially polled, the juror, one juror announced that the verdict of guilty was not her verdict. The Court retired the jury again and ordered them to continue deliberating. There was a second polling of the jury at which the juror said that it was her verdict.

> After the trial was concluded, Mr. Engel witnessed the very same juror come back into the courtroom and heard her state that she was pressured and intimidated by other jurors and that the jury Foreman had forced her to say that the verdict, her verdict was guilty even though it was not.

> Mr. Engel states that the juror, when she made these statements to the Court after the passing of sentence appeared to be distraught, visibly disturbed, agitated. He described her as shook up.

29

The same juror again approached Mr. Engel outside the courthouse after the conclusion of the trial and restated her feelings that she had been forced, coerced and pressured and that the verdict that was entered was not her verdict.

Ms. Hunt is the mother of the Defendant, Sam Fletcher. She was present for the trial. She was present in the courtroom when the jury returned its verdict and when the Court passed sentence.

She states that someone came up to her in the hall outside the courtroom trying to get her attention at least three times saying, "I don't know what to do," that this person who approached Ms. Hunt was known to her to be one of the 12 jurors. This person appeared to be upset, distraught, excited and confused.

She -- Ms. Hunt would further state that the juror went into the courtroom and tried to make the Court aware that -- and in particular the Judge aware that the verdict that was entered was not her verdict, that she had been pressured or coerced by the other jurors into entering that verdict and that that was not her verdict.

The State called S. Williams, a paralegal for the District Attorney's office, to refute appellant's counsel's recitation of events related to the juror who changed her vote. Williams testified that she was present both times the jury was polled after announcing its verdict, and she confirmed that the juror at issue stated that "guilty" was not her vote the first time polled, but after further deliberations, she confirmed that "guilty" was then her vote.

Williams's version of the interaction between the juror and appellant's mother and friend differed from that represented by appellant's counsel in his bill of review. Williams saw the juror, accompanied by appellant's mother and a person who had sat with appellant's family throughout the trial, come back into the courtroom. At that point, neither the State's attorney nor appellant's attorney were

30

in the courtroom. Williams explained that appellant's mother "was on one side of the juror and the other guy was on the opposite side of the juror. They were both holding her and they were both speaking to her at the same time. It kind of seemed like they were bulldozing over her." Williams described their manner towards the juror as "aggressive." Williams explained that when the bailiff intervened, appellant's family was aggressive towards him as well. The bailiff was able to separate the juror from appellant's family by escorting her out into the hallway.

Bailiff H. Graviel also testified at the hearing that he saw appellant's family trying to forcefully bring the juror into the courtroom. After Graviel separated the juror from appellant's family to prevent things from "escalat[ing] further," Graviel told the juror that if she wanted to speak to the district attorney or appellant's attorney, Graviel would bring them out to the hallway to speak to her. The juror responded that she wanted to leave and did not want to speak to anyone.

The trial court denied appellant's motion for new trial, and made the following findings of fact and conclusions of law in support:

1. The applicant's claim that the verdict was decided in a manner that was not a fair expression of the jurors' opinion is without merit.

2. The record reflects that despite one juror's initial response that the verdict was not unanimous, after additional deliberation, when the guilty verdict was taken, each juror responded that "this was [their] verdict."

3. No juror was present at the motion for new trial hearing.

31

4.    No evidence of any kind was presented of any outside influence upon the jury.

5.    No evidence of any kind was presented that any juror was not qualified to serve.

6.    The only evidence presented at the motion for new trial was that the same juror who had initially stated that the guilty verdict was not her verdict entered the courtroom after sentencing.

7.    The court did not consider any statement (which was attempted to be entered into evidence via either hearsay or a bill of exception) which purported to be an inquiry into the validity of the verdict, in accordance with Tex. Rule Evid. 606.

8.    The evidence presented at the motion for new trial demonstrated that the defendant's mother and friend were aggressive with the juror after sentencing and Deputy Hernandez, the bailiff, intervened.

9.    According to the credible testimony of Deputy Hernandez, Hernandez separated the juror from the defendant's supporters, and gave the juror the opportunity to wait to speak with the State, the defense attorney, and/or the judge, and the juror declined.

10.    The evidence demonstrates the verdict was decided in a regular manner, and was a fair expression of the juror's opinion.

**A. Applicable Law and Standard of Review**

A defendant cannot be convicted of a crime by less than a unanimous jury verdict. *Ngo v. State*, 175 S.W.3d 738, 745 (Tex. Crim. App. 2005). A motion for new trial is reviewed on an abuse of discretion standard. *McQuarrie v. State*, 380 S.W.3d 145, 150 (Tex. Crim. App. 2012). To find an abuse of discretion, the trial court's ruling must be shown to be arbitrary or unreasonable. *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006). To support a motion for new trial based

on juror misconduct, affidavits or other evidence must be offered. *Tinker v. State*, 148 S.W.3d 666, 673 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

For purposes of the hearing, the judge alone determines the credibility of the witnesses. *Colyer v. State*, 428 S.W.3d 117, 122 (Tex. Crim. App. 2014). Rule 606(b) of the Texas Rules of Evidence prohibits "disgruntled juror" evidence. The only exception is evidence of "an outside influence" on a juror, i.e. "something originating from a source outside of the jury room and other than from the jurors themselves." *McQuarrie*, 380 S.W.3d at 154. The policy reasons supporting these limitations have been explained by the Court Criminal Appeals:

> Mr. Aguilera's post-trial testimony that his desired verdict had been "not guilty" was inconsistent with his trial-time statement that the guilty verdict was "unanimous." The policy of upholding the finality of verdicts was served in this case by polling the jury. At that time, Mr. Aguilera said that he agreed with the guilty verdict. After the jurors were excused, the time for post-verdict doubts had passed. Given Mr. Aguilera's shifting testimony, a reasonable fact finder could have concluded that the juror had been somewhat reluctant at the time of the verdict, but it was not until after weeks of reflection that he decided that he wanted to change his vote. This is precisely the type of "disgruntled juror" who suffers buyer's remorse that Rule 606(b) prohibits from testifying to impeach his own verdict. A juror's vote, when polled in open court, is a "final sale" item; it cannot be exchanged because that juror later has buyer's remorse.

*Colyer*, 428 S.W.3d at 126.

## B. Analysis

In his third point of error, appellant argues that the trial court should have granted his motion for new trial because the jury's verdict was non-unanimous

given that Juror Number 1 told his mother and friend that she had been pressured into agreeing to a "guilty" verdict. Additionally, in his brief here, appellant argues that the court should have removed Juror Number 1 mid-trial after the court questioned her about "appear[ing] sleepy, inattentive, and often had her eyes closed." Appellant acknowledges that (1) Juror Number 1 told the court that, despite her sleepy appearance, she had heard all of the evidence and stated she thought she could come to a fair verdict and (2) rather than seek to have her removed from the jury at that point, appellant actually objected when the State moved to have her replaced with an alternative juror.

The State responds that "The record before the trial court more than supported the conclusion that the verdict reached was a fair determination of the issue reached by a unanimous jury as indicated by the unanimous agreement of every juror during the polling the trial court obtained before it accepted the verdict." We agree.

The trial court has broad discretion in ruling on a motion for new trial. *McQuarrie*, 380 S.W.3d at 150. And the trial court is the sole judge of credibility of witnesses at a motion for new trial hearing. *Colyer*, 428 S.W.3d at 122. Here, the trial court made specific findings that bailiff Hernandez's testimony was credible, and that Hernandez had to intervene when appellant's supporters became aggressive with Juror Number 1. The court also found, as is supported by the

34

record, that (1) the jury's verdict was unanimous and (2) no evidence was presented of any outside influence upon the jury or that any juror was not qualified to serve. Accordingly, the trial court did not abuse its discretion in denying appellant's motion for new trial.

We overrule appellant's third point of error.

## SUFFICIENCY OF THE EVIDENCE

### A. Applicable Law and Standard of Review

The jury was charged with the definition of aggravated robbery under section 29.03(a)(2) of the Texas Penal Code, providing that a "person commits an offense if he commits robbery . . . . and he uses or exhibits a deadly weapon," and on the law of the parties under section 7.02(a)(2) of the Texas Penal Code, providing that a "person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense."

When reviewing whether there is legally sufficient evidence to support a criminal conviction, the standard of review we apply is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979) (emphasis in

original). This standard tasks the factfinder with resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from basic facts. *Id*. On appeal, reviewing courts "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *See Murray v. State*, 457 S.W.3d 446, 448–49 (Tex. Crim. App. 2015) (citing *Hooper v. State*, 214 S.W.3d 9, 12 (Tex. Crim. App. 2007)). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Guevara*, 152 S.W.3d at 49.

### B. Analysis

Appellant argues that there is no evidence that he himself was present at the Villanuevas' home, as no one at the scene positively identified him. He also notes that his fingerprints were not found on the items in the Jeep. He contends that no rational trier of fact could have found him guilty of aggravated robbery as a participant or a co-conspirator because, at most, the evidence demonstrated that he admitted to driving the get-away vehicle.

36

Appellant's argument does not take into account all of the evidence—direct and circumstantial—before the jury. Appellant does not dispute that an aggravated robbery took place at the Villanuevas' house, or that the Jeep was the get-away car that contained all the instrumentalities, weapons, and spoils of that robbery.

Appellant was dressed in black and is similar in size and description to the descriptions given by the robbery victims. Appellant changed his story, first claiming he was not involved at all, then claiming he was hired by a drug dealer to move a vehicle from one location to another for $350. Then he changed his story completely, claiming that he was picked up by men he did not know, waited a significant amount of time for a white Jeep to show up, got into the Jeep and ran from the police.

Appellant's cell phone was found in the Jeep, and he had thousands of dollars cash in his possession bundled in the same manner as the money stolen from the Villanuevas' home. He offered varying accounts of how his cell phone ended up in the Jeep (first that he dropped it reaching into the vehicle, and then that he dropped it because he was riding in or driving the Jeep) and how he ended up with $5,900 in cash bundles (first that he stole it from the Jeep after spotting it through the window, and then that he stole it from the floorboard of the vehicle because one of the robbers dropped it there and the robbers were not paying attention to it).

Given the Jeep's undeniable association with the robbery, the victims' descriptions of the perpetrators, and appellant's ever-changing story, a rational jury could have determined that appellant participated in the robbery or—at a minimum—intended to aid those who did. A rational jury could have disbelieved that he just happened to be picked up on a side street by people he did not know, waited until robbers arrived in the white Jeep, and then hopped into the Jeep crowded with people and loaded with police garb, firearms, electronics and money without any prior knowledge of, or plan to assist with, the robbery. The jury could also plausibly have believed that the $5,900 in appellant's possession was appellant's cut of the robbery proceeds rather than money he managed to steal undetected off the floor of a vehicle crowded with people while in a police chase. Because a rational jury could have found appellant guilty beyond a reasonable doubt, appellant has not demonstrated that there is insufficient evidence to support his conviction.

We overrule appellant's fourth point of error.

## REFORMATION OF THE JUDGMENT

At the beginning of the sentencing hearing, the following exchange took place:

> [THE STATE]: . . . . "Before the commission of the offense alleged above, on April 16th of 1996, in Cause No. 9416659 in the 339th District Court of Harris County, Texas, the Defendant was convicted of the felony offense of aggravated assault, peace officer."

38

THE COURT: How do you plead to the enhancement paragraph? Do you plead true or not true?

THE DEFENDANT: True.

THE COURT: A plea of true will be received. You may be seated.

The trial court then admitted into evidence a "Stipulation of Evidence," signed by appellant and his counsel, stipulating to four prior convictions, including the one the subject of the sentencing enhancement. Finally, the "Judgment Adjudicating Guilt" for the aggravated assault of a police officer that was the subject of the sentencing enhancement was admitted into evidence with no objection.

The court's written judgment, however, contains "N/A" in the spaces for "Plea to 1st Enhancement Paragraph," and "Findings on 1st Enhancement Paragraph." The State thus contends, correctly, that the "trial court's judgment does not accurately reflect the events which occurred in the trial court." As the State notes, "[appellant] pled true to the enhancement, the trial court accepted his plea, and the inference is that the trial court found the enhancement true." *See Donaldson v. State*, 476 S.W.3d 433, 439 (Tex. Crim. App. 2015) (recognizing appellant's plea of "true" to an enhancement allegation is sufficient to satisfy State's burden of proof for enhancement, and "in the absence of any other evidence that the trial court rejected the State's proof on the enhancement or that

enhancement would be improper," would also support implied finding of "true" by trial court).

We have the authority to "correct and reform a judgment of the court below to make the record speak the truth when it has the necessary data and information to do so." *Asbury v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd); TEX. R. APP. P. 43.2(b) ("The court of appeals may modify the trial court's judgment and affirm it as modified."). "The authority of an appellate court to reform incorrect judgments is not dependent upon the request of any party, nor does it turn on the question of whether a party has or has not objected in the trial court." *Asbury*, 813 S.W.2d at 529.

Accordingly, we grant the State's request that we reform the judgment to reflect that appellant pleaded "true" to the enhancement and that the trial court found it "true."

## CONCLUSION

We affirm the trial court's judgment as modified.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Higley and Huddle.

Do not publish. TEX. R. APP. P. 47.2(b).